1

**MILBERG PHILLIPS GROSSMAN LLP**

2

David Azar (State Bar No. 218319)

3

16755 Von Karman Avenue, Suite 200
Irvine, California 92606

4

Telephone:   212-594-5300
Email:       dazar@milberg.com

5

6

*Attorneys for Plaintiff and the Potential Class*
*Additional Counsel on Signature Page*

7

8

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

9

10

11

MATTHEW AJZENMAN; SUSAN
TERRY-BAZER; BENNY WONG;
ALEX CANELA; JEREMY WOOLLEY;
AMANDA WOOLLEY; ANNE
BERGER; and KRYSTAL MOYER, on
behalf of themselves, and all others who
are similarly situated,

12

13

14

15

16

Plaintiffs,

17

v.

18

OFFICE OF THE COMMISSIONER OF
BASEBALL, an unincorporated
association doing business as MAJOR
LEAGUE BASEBALL, et al.,

19

20

21

Defendants.

22

CASE NO. 2:20-cv-03643-DSF (JEMx)

**PLAINTIFF TERRY-BAZER'S
OPPOSITION TO THE
TICKETMASTER DEFENDANTS'
MOTION TO COMPEL
ARBITRATION**

Date:   September 14, 2020
Time:   1:30 p.m.
Place:  Courtroom 7D
Judge:  Honorable Dale S. Fischer

23

24

25

26

27

28

1

2

## <u>TABLE OF CONTENTS</u>

**PRELIMINARY STATEMENT and INTRODUCTION**.................................1

**LEGAL STANDARD AND SUMMARY OF ARGUMENT**.........................2

I.  **Argument**....................................................................3

   A. Plaintiff Terry-Bazer Did Not Know of LN/TM's  TOU And Was Not on Proper Inquiry Notice ...............................................................3

      1.  LN/TM's Browse Wrap Notice Is Inconspicuous..........................6

      2.  LN/TM's Sign-In and Purchase Page Notices Are Inconspicuous.................8

         A.  The Sign-In Page Notice Is Inconspicuous .........................8

         B.  The Purchase Page Notice Is Inconspicuous .....................10

      3.  LN/TM's Notices Do Not Objectively Evidence Assent.............12

         A.  The Sign-In Page Notice Does Not Objectively Evidence Assent.....12

         B.  The Purchase Page Does Not Objectively Evidence Assent .............15

      4.  LN/TM's Use of  Varied and Multiple Notices Tricks Consumers..............15

      5.  LN/TM's Arbitration Clause Violates JAMS's Rules .................16

**CONCLUSION**..........................................................19

# TABLE OF AUTHORITIES

**Cases**

*Applebaum v. Lyft, Inc.*,
  263 F. Supp. 3d 454 (S.D.N.Y. 2017) ................................................ *passim*

*Arena v. Intuit Inc.*,
  No. 19-cv-02546-CRB, 2020 WL 1189849 (N.D. Cal. Mar. 12, 2020) .............. *passim*

*Colgate v. Juul Labs, Inc.*,
  402 F. Supp. 3d 728 (N.D. Cal. 2019) .................................................. 9, 10

*DeVries v. Experian Info. Solutions, Inc.*,
  No. 16-cv-02953-WHO, 2017 WL 733096 (N.D. Cal. Feb. 24, 2017) ..................... 14

*Fteja v. Facebook, Inc.*,
  F. Supp. 2d 829 (S.D.N.Y. 2012) ....................................................... 14

*Himber v. Live Nation Worldwide, Inc.*,
  No. 16-CV-5001 (JS) (GRB), 2018 WL 2304770 (E.D.N.Y. 2018) .......................... 7

*Knutson v. Sirius XM Radio Inc.*,
  771 F.3d 559 (9th Cir. 2014) ........................................................ 5, 12

*Kum Tat Ltd. v. Linden Ox Pasture, LLC*,
  845 F.3d 979 (9th Cir. 2017) ........................................................... 2

*Lee v. Ticketmaster L.L.C.*,
  No. 3:18-cv-05987-VC, 2019 WL 9096442 (N.D. Cal. Apr. 1, 2019) ...................... 5

*Lomeli v. Midland Funding, LLC*,
  No. 19-CV-01141-LHK, 2019 WL 4695279 (N.D. Cal. Sept. 26, 2019) .................... 4

*Lopez v. Terra's Kitchen, LLC*,
  331 F. Supp. 3d 1092 (S.D. Cal. 2018) ................................................. 7

*Nghiem v. Dick's Sporting Goods, Inc.*,
  No. SACV 16-00097-CJC (DFMx), 2016 WL 9131962 (C.D. Cal. July 5, 2016) .. 7, 8

*Nguyen v. Barnes & Noble Inc.*,
  763 F.3d 1171 (9th Cir. 2014) ...................................................... *passim*

*Norcia v. Samsung Telecomms. Am., LLC*,
  845 F.3d 1279 (9th Cir. 2017) ......................................................... 3

*Rodman v. Safeway Inc.*,
    125 F. Supp. 3d 922 (N.D. Cal. 2015) ............................................................ 4

*Saizhang Guan v. Uber Techs., Inc.*,
    236 F. Supp. 3d 711 (E.D.N.Y. 2017) ................................................. 13, 14

*Swift v. Zynga Game Network, Inc.*,
    805 F. Supp. 2d 904 (N.D. Cal. 2011) ................................................. 13, 14

*Wilson v. Huuuge, Inc.*,
    944 F.3d 1212 (9th Cir. 2019) ............................................................ 7

**Other**

9th Cir. R. 36-3 ............................................................ 5

ii

## **PRELIMINARY STATEMENT and INTRODUCTION**

Plaintiff Susan Terry-Bazer submits this brief in opposition to the Ticketmaster, LLC and Live Nation Worldwide, Inc.'s ("LN/TM" and/or "Ticketmaster Defendants") Motion to Compel Arbitration of her claims (ECF No. 61).  LN/TM has separately moved to dismiss the claims of the other Plaintiffs (ECF No. 65),[1] and those Plaintiffs will file a separate opposition to that motion.[2]

This case was filed because of Defendants' concerted and joint decision not to refund money to purchasers of baseball tickets for the 2020 major league baseball (MLB) season (the "Action").[3] These tickets cannot be used because of the COVID-19 global pandemic. In the face of this unprecedented health and economic crisis, LN/TM, a massive business with far better access to capital than their customers -- the members of the Class -- have refused to do what so many other businesses have done: refund the money immediately to consumers. This Action alleges that if any MLB games are played in 2020, they will not be played as scheduled, where scheduled, and with fans in attendance. *See* ECF No.16 at ¶¶ 3, 88. In June of 2020, the entire 2020 MLB season was reduced and rescheduled to 60 games (instead of the normal 162), with only the speculative possibility of very limited fan attendance later in the "season."[4]

---

[1] LN/TM's motion to dismiss has been filed against Plaintiffs Matthew Azjenman, Benny Wong, Alex Canela, Jeremy Wooley, Amanda Woolley, Anne Berger, Krystal Moyer, Blake Wollam, and Cathey Mattingly. ECF No. 65. On July  28, 2020, Plaintiffs Mattingly and Wollam voluntarily dismissed their claims. ECF Nos. 75-76, respectively.

[2] The enforceability of LN/TM's arbitration clause is currently being briefed in an antitrust case filed on April 28, 2020, and pending before the Hon. George H. Wu. *See Olivia Van Iderstine v. Live Nation Entm't, Inc.*, No. 2:20-CV-03888 (C.D. Cal. Apr. 28, 2020).

[3] In addition to LN/TM, Defendants in this case are: StubHub, Inc. and Last Minute Transactions, Inc., the Office of the Commissioner of Baseball, Robert D. Manfred, Jr. (the Commissioner of Baseball), and the thirty MLB teams and certain affiliates thereof.

[4] Andrew Simon, *MLB's 60-game schedule for 2020 unveiled*, MLB.COM (July 6, 2020), https://www.mlb.com/news/2020-major-league-baseball-schedule-released.

PLAINTIFF TERRY-BAZER'S OPPOSITION TO THE TICKETMASTER DEFENDANTS'
MOTION TO COMPEL ARBITRATION

## LEGAL STANDARD AND SUMMARY OF ARGUMENT

The burden is on LN/TM to establish, by a preponderance of the evidence, that an agreement to arbitrate was formed. The issue of whether an agreement was formed is for the Court to decide, even where the arbitration clause delegates "gateway" issues of enforceability to the arbitrator. *Kum Tat Ltd. v. Linden Ox Pasture, LLC*, 845 F.3d 979, 983 (9th Cir. 2017) ("[C]hallenges to the very existence of the contract are, in general, properly directed to the court.").

LN/TM's motion should be denied as no agreement to arbitrate was formed between Plaintiff Terry-Bazer and LN/TM. As her declaration states, she did not see LN/TM's terms of use ("TOU"), did not read them, and would not have agreed to them had she known of them. *See* accompanying Terry-Bazer Decl. at ¶¶ 8-11. Lacking evidence that Plaintiff Terry-Bazer had actual notice of the TOU, LN/TM rely on the doctrine of inquiry or constructive notice, arguing Plaintiff Terry-Bazer is bound by hyperlinked terms on the "ticketmaster.com" website to which she supposedly agreed to by taking certain actions, including merely browsing the website. Courts require companies relying on hyperlinked agreements to prove there was affirmative assent to the agreement, which requires that LN/TM prove that: (1) the links are conspicuous to the reasonably prudent person in the context of the overall design of the webpage; and (2) the person to be bound took an affirmative action indicating acceptance of the offered terms. LN/TM fails on both points.

The issue of whether the links were sufficiently conspicuous is fact-dependent, and determined by analyzing the webpages as they appeared at the relevant time.  LN/TM's reliance (at 1) on other decisions enforcing its agreements in other cases based on the appearance of LN/TM websites years ago is unavailing.  Moreover, none of those decisions are binding on this Court, or provide a perpetual shield for LN/TM's conduct from judicial scrutiny. *See, e.g.*, *Arena v. Intuit Inc.*, No. 19-cv-02546-CRB, 2020 WL 1189849, at *16 (N.D. Cal. Mar. 12, 2020) (denying Intuit's motion to compel arbitration despite previous enforcement of the clause by other courts), appeal docketed, No. 20-15466 (9th Cir. Mar.

2

18, 2020).

As discussed below, LN/TM's linked TOU was not conspicuous. The links were in font smaller than any other writing on the relevant pages, were not underlined, and were placed on pages containing other content, including photographs, banners, and other distractions. LN/TM's links to the TOU are considerably less conspicuous than other webpages held to be insufficient in recent decisions.

In addition to the TOU links being impermissibly inconspicuous, LN/TM does not accompany the links with a clear instruction to consumers that, if taken, would constitute objectively manifestation of their assent to the terms. For example, LN/TM's instruction that "by continuing past this page you agree to our Terms of Use . . ." does not, as they claim, clearly instruct consumers that clicking a sign-in button denotes acceptance of the contract. LN/TM says in its brief (at 4) that signing in denotes acceptance, but the actual language on the LN/TM webpage does not say that consumers accept the contract by signing-in. "Continuing past this page" does not have a sufficiently clear and objective meaning, and the condition can be triggered in many ways other than by signing-in that plainly would not indicate an intent to agree to terms, including, for example, by clicking the TOU link itself to merely view the terms. As detailed below, the formulation is so confusing that it confounds even LN/TM.

LN/TM's arbitration clause is also unenforceable, and should not be sent to JAMS (the arbitral forum specified in the TOU), because it fails to meet JAMS's minimum requirements for consumer arbitration clauses, specifically, the requirement that an arbitration clause not discourage the use of counsel.

Accordingly, LN/TM's motion should be denied in its entirety.

I.   **ARGUMENT**

   A.   **Plaintiff Terry-Bazer Did Not Know of LN/TM's
          TOU And Was Not on Proper Inquiry Notice**

The burden is on LN/TM to prove the existence of an "agreement to arbitrate by the

preponderance of the evidence." *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017). The standard is evidentiary: "[i]n determining the existence and validity of an agreement to arbitrate, 'a court applies a standard similar to the summary judgment standard of Fed. R. Civ. P. 56.'" *Lomeli v. Midland Funding, LLC*, No. 19-CV-01141-LHK, 2019 WL 4695279, at *4 (N.D. Cal. Sept. 26, 2019) (internal citation omitted).

Issues about the formation of contracts on the internet are decided by age-old contract rules: "[i]n determining whether a valid arbitration agreement exists, federal courts apply ordinary state-law principles that govern the formation of contracts." *Nguyen v. Barnes & Noble Inc*., 763 F.3d 1171, 1175 (9th Cir. 2014) (internal citation and quotation marks omitted). *See id*. As with any contract, LN/TM must prove that Plaintiff Terry-Bazer affirmatively accepted their offer to enter into the TOU.

LN/TM do not argue that Plaintiff Terry-Bazer accepted the TOU because she clicked on the terms, read them, and actually agreed to them. And indeed, she did not. She was not aware of the TOU and did not read it. Had she read it she would not have agreed to it. *See* Terry-Bazer Decl. at ¶¶ 8-11. LN/TM rely (at 12-13) Accordingly, LN/TM rely on the doctrine of inquiry or constructive notice. *See Barbanell v. One Med. Gp.*, No. CGC-18-566232, 2019 Cal. Super. LEXIS 1411, at *10 (Cal. Super. Ct., Apr. 3, 2019) ("[A] court may find that an individual assented to an electronic agreement if a 'reasonably prudent user' would have been put 'on inquiry notice' of the terms of the contract (internal citations omitted).

To begin with, courts will not honor online agreements if the hyperlinked text leading to the agreement is not conspicuous -- a determination that looks to the font, color, underlining, relative size of the hyperlinked terms to other text and links on the page, and any other common sense factors bearing on whether consumers are likely to see it. *See Barbanell,* 2019 Cal. Super. LEXIS 1411, at *10-11.

The analysis of whether LN/TM's links are conspicuous must examine the actual

4

page reviewed by Plaintiff Terry-Bazer, and "[t]his is a highly fact-specific inquiry that looks to 'the conspicuousness and placement of the 'Terms of Use' hyperlink, other notices given to users of the terms of use, and the website's general design.'" *Rodman v. Safeway Inc.*, 125 F. Supp. 3d 922, 945 (N.D. Cal. 2015). (internal citation omitted).

LN/TM admits that the "look and feel" of their web pages containing the links to the TOU changed "slightly" over time. *See* ECF No. 62 at ¶¶ 2, 5, 7. But the significance of the "look and feel" of the pages *changing* is the issue, despite LN/TM's attempt to downplay the significance of such changes. LN/TM's arbitration clause cannot be binding merely by virtue of prior court approval when the appearance of their websites are constantly changing. LN/TM's cited cases (at 1) are not binding on this Court, and the decision in *Lee v. Ticketmaster L.L.C.*, No. 3:18-cv-05987-VC, 2019 WL 9096442 (N.D. Cal. Apr. 1, 2019), *aff'd*, No. 19-15673, 2020 WL 3124256 (9th Cir. June 12, 2020), which LN/TM relies on, is unpublished and non-precedential, and did not address the same webpages at issue here. *See* 9th Cir. R. 36-3(a) ("Unpublished dispositions and orders of this Court are not precedent, except when relevant under the doctrine of law of the case . . . .").

In addition to being conspicuous, there must be an instruction accompanying the link to the TOU that asks the consumer to do something that "constitute[s] an objective manifestation of his assent to the arbitration provision." *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014). The Ninth Circuit has held that including a conspicuous "terms of use" hyperlink on a webpage, even if placed adjacent to an action button ("sign-in," for example), will not suffice without a prompt to consumers to take an action demonstrating their acceptance of the terms:

> [W]here a website makes its terms of use available via a conspicuous hyperlink on every page of the website but otherwise provides no notice to users **nor prompts them to take any affirmative action to demonstrate assent**, even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice.

*Nguyen*, 763 F.3d at 1178-79 (emphasis added). LN/TM claim (at 3) that Plaintiff Terry-Bazer assented to the TOU in three ways: (1) because she was presented with a link to the TOU when she signed-in to her account; (2) when she bought her tickets; and (3) by browsing the ticketmaster.com website. As discussed below, none of these methods provide conspicuous notice, and, even if they did, LN/TM cannot meet its evidentiary burden of demonstrating that vague language about "continuing past this page" objectively denotes assent.

### 1.    **LN/TM's Browse Wrap Notice Is Inconspicuous**

LN/TM allege (at 3) that Plaintiff Terry Bazer agreed to arbitrate this dispute because by browsing and buying tickets on the Ticketmaster website, she "had to navigate through various pages of the site, virtually all of which inform users that by using the site they are agreeing to the Terms." ECF No. 61 at 5.

LN/TM's brief (at 4) includes a close-up of the relevant language, but this is not how it appears on the website. The webpages containing the relevant language is shown instead by Exhibits 3-4 of the Tobias Decl. (ECF No. 62), with Exhibit 3 being LN/TM's homepage and Exhibit 4 a page showing a stadium seating chart. Notably, Exhibit 3 of the Tobias Decl. is 4 pages long. On the website, however, it is all on one scrollable page, containing hundreds of links and pieces of content, including dozens of advertised events with color photos of the performers, ensuring no one would see the notice. The TOU is found on page 4 of the Tobias Decl., at the bottom, below 27 other links immediately above it (ignoring the hundreds of other clickable links and graphics), and is in the smallest font used on the page. The notice could not be less conspicuous. It should also be kept in mind that unlike the courts tasked with deciding whether links are sufficiently visible, consumers do not visit websites to quest for buried legal notices.

The linked TOU shown on Exhibit 4 to the Tobias Decl. is also inconspicuous. It does not stand out on a page containing a bright blue header with a photo of the performer, multiple links for tickets, and is in tiny gray font smaller than any other on the page. ECF

No. 62, Ex. 4.

Courts hold that notices that purport to bind consumers by continued use of a website, without requiring them to at least click an action button to continue, are called "browse wrap" agreements and are almost always deemed insufficient. As the Ninth Circuit has held, "courts will not enforce agreements where the terms are 'buried at the bottom of the page or tucked away in obscure corners of the website.'" *Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1220-21 (9th Cir. 2019) (internal citation omitted); *see also Lopez v. Terra's Kitchen, LLC*, 331 F. Supp. 3d 1092, 1110 (S.D. Cal. 2018) (refusing to enforce an agreement linked at the bottom of a webpage); *Nghiem v. Dick's Sporting Goods, Inc.*, No. SACV 16-00097-CJC(DFMx), 2016 WL 9131962, at *3 (C.D. Cal. July 5, 2016) (Carney, J.) (rejecting as insufficient a notice placed at the "footer" of the page and surrounded by dozens of other links).

LN/TM claim (at 3-4) that *Himber v. Live Nation Worldwide, Inc.*, No. 16-CV-5001(JS) (GRB), 2018 WL 2304770 (E.D.N.Y. 2018) held that the browse wrap agreement on the Live Nation website in June of 2016 provided sufficient notice. But Plaintiff Terry-Bazer bought her tickets from the ticketmaster.com website in 2020, not from the Live Nation site in 2016. *See* Terry-Bazer Decl. at ¶4. Even if LN/TM had established that the "look and feel" of the web pages in *Himber* were the same as those relevant here, *Himber* did not rely on only a finding of inquiry notice: "Himber does not deny having actually seen or read the Terms of Use, including the arbitration provision, when he made earlier ticket purchases online." *Id*. at *4. Plaintiff Terry-Bazer *does* deny this. *See* Terry-Bazer Decl. at ¶¶ 8-11.

In any event, LN/TM's browse wrap notice is precisely the type of notice "'buried at the bottom of the page or tucked away in obscure corners of the website'" that the Ninth Circuit has criticized as unenforceable. *Wilson*, 944 F.3d at 1220-21 (internal citations omitted). If the legal requirement of sufficient notice and acceptance mean anything, it cannot countenance LN/TM's argument that an agreement to arbitrate was formed by

consumers merely browsing past practically invisible text.

### 2. LN/TM's Sign-In and Purchase Page Notices Are Inconspicuous

#### A. The Sign-In Page Notice Is Inconspicuous

LN/TM's brief (at 4-5) purports to reproduce the sign-in notice. But these are close-ups of the relevant language in isolation. They are not a reproduction of the pages on which they appeared when Plaintiff Terry-Bazer bought her tickets, and it is those pages that must be examined. *See Nghiem*, 2016 WL 9131962, at *8. (Proper notice "'depends on the design and content of the website and the agreement's webpage'. The 'conspicuousness and placement' of a hyperlink to a website's terms of use, any 'other notices given to users' of those terms, and the 'website's general design' should all be consulted when determining whether a user is on inquiry notice of terms of use containing an arbitration agreement.") (internal quotations omitted).

LN/TM do not submit the actual pages viewed by Plaintiff Terry-Bazer when she signed-in and purchased the tickets at issue in this case on March 5, 2020. Rather, in her declaration, Ms. Tobias states that "[u]sers of the Ticketmaster website in March 2020 would have seen the same" pages included as Exhibits 1-2 of the Tobias Decl. *Id.* at ¶¶ 4, 6. Even assuming, *arguendo*, that assertion is correct, LN/TM's argument has no merit.

The sign-in page that Plaintiff Terry-Bazer allegedly viewed on her computer when she signed-in to her account appears as follows:[5]



---

[5] Screenshot at TICKETMASTER, https://www.ticketmaster.com (last visited July 30, 2020).

This design is virtually indistinguishable from other sign-in screens deemed insufficient in other cases. For example, in the recently decided *Arena*, 2020 WL 1189849, at *2-3, the court, consistent with other decisions cited in *Arena*, denied the motion to compel arbitration because, like LN/TM's links here, the hyperlinks in that case were not underlined and were smaller than other text on the page. *See id.* at *3 ("TurboTax falls short of the gold standard. Its hyperlinks were blue, but not underlined."). Indeed, the notice deemed insufficient in *Arena* (reproduced in the opinion) was on a significantly less busy and distracting page than the LN/TM sign-in page.

Merely using different color for text in an agreement, as LN/TM's sign-in screen does, is insufficient. *See Applebaum v. Lyft, Inc*., 263 F. Supp. 3d 454, 467 (S.D.N.Y. 2017) ("A reasonable consumer would not have understood that the light blue 'Terms of Service' hyperlinked to a contract for review. Coloring can be for aesthetic purposes. Courts have required more than mere coloring to indicate the existence of a hyperlink to a contract."). Moreover, LN/TM's sign-in box is not merely text; it is a graphic box with the words "sign in" appearing within it, and clicking anywhere on it will execute the sign-in, making it far more visible and easier to click than the purely textual "terms of use." Consumes interested in buying tickets are far more likely to miss the TOU link and its accompanying tiny grey text and be drawn instead to the "sign in" graphic.

A comparison of the sign-in page and hyperlinks deemed insufficient in *Colgate v. Juul Labs, Inc*., 402 F. Supp. 3d 728, 764-65 (N.D. Cal. 2019) shows that it is similar to LN/TM's page, with the evident differences being unfavorable to LN/TM because the *Colgate* screenshots do not contain any distracting content on the page. In contrast, LN/TM's pages all contain distracting content, as detailed above. Like the hyperlinks in *Colgate*, LN/TM's hyperlinks and the "you agree" text itself, is in significantly smaller font than anything else on the page; it is smaller than the "New to Ticketmaster? Sign Up" link and is smaller and fainter than the headings above the username and password fields. Indeed, the sign-in page in *Colgate* was significantly better than LN/TM's sign-in page, in

terms of visibility, because it did not have any distracting content. *Colgate,* 402 F. Supp. 3d at 764. The sign-in page Plaintiff Terry-Bazer saw is dominated by a large, eye-grabbing photo of concert-goers, with much larger text touting "Your All-Access Pass" in large aqua-green text, and contains several other links all in or near the sign-in box ("Sign Up", "Forgot Password," and "Help Us Improve").



It is also important to note that before arriving at the sign-in page, consumers would have navigated an untold number of other pages with dozens of hyperlinked text, numerous other graphic-hyperlinks, and photos of events and performers, only a fraction of which could be of interest to any one consumer. It is unreasonable to expect consumers to read every link on LN/TM's website for relevance, which is why LN/TM's sign-in and purchase buttons are the most prominent links on the page.

**B.    The Purchase Page Notice Is Inconspicuous**

LN/TM's purchase page is no better than the sign-in page: it is busier, contains

10

numerous fields for payment and address that must be completed, has a bright blue banner at the top, and a brightly green "Place Order" graphic-hyperlink whose font size dwarfs the non-underlined text containing the hyperlinks, and the payment box itself contains a large photo:

[6]



Document title: Ticketmaster Payment
Capture URL: https://www.ticketmaster.com/resale/checkout/order

LN/TM does all it can to draw attention away from the TOU, and, as detailed below, should a consumer notice the words "terms of use" it is unclear what must be done to agree to them.

_____

[6] Tobias Decl. (ECF No. 62, Ex. 2).

PLAINTIFF TERRY-BAZER'S OPPOSITION TO THE TICKETMASTER DEFENDANTS'
MOTION TO COMPEL ARBITRATION

### 3.   LN/TM's Notices Do Not Objectively Evidence Assent

#### A.   The Sign-In Page Notice Does Not Objectively Evidence Assent

In addition to the TOU being inconspicuous, LN/TM fails to prove that its TOU link is accompanied by clear instructions on how consumers should objectively manifest agreement to the TOU. This is an independent basis to deny LN/TM's motion, even if the notices are deemed to be sufficiently conspicuous. *See Nguyen*, 763 F.3d at 1178. The Ninth Circuit requires "**objective manifestation**" of assent. *Knutson*, 771 F.3d at 565 (emphasis added).

The language with which LN/TM seeks to bind consumers states in the sign-in page (which consumers would see before the purchase page): "By continuing past this page you agree to the Terms of Use and understand that information will be used as described in our Privacy Policy" ECF No. 62 at ¶ 4. "Terms of Use" and "Privacy Policy" are links that if clicked, open new pages with the respective agreement and policy. But it is not explained what "continuing past this page" means, nor is it explained that signing-in satisfies that condition.  LN/TM says in their brief (at 4) that consumers accept the contract by signing in. But the actual language on the sign-in screen does not in fact say that consumers accept the contract by signing-in, and signing-in is therefore not an objective manifestation of assent.

LN/TM's formulation, "continuing past this page," also reasonably describes what happens when clicking *anything* on the page, including "Terms of Use": it takes consumers away from the sign-in page to another page on the Ticketmaster website containing the TOU; to view the TOU requires "continuing past" the page that contained the link. Merely viewing terms to a contract could not possibly constitute objective manifestation to be bound by the contract. But a perfectly reasonable interpretation of LN/TM's formulation is that by viewing the TOU, consumers have already agreed, and so the reasonably prudent consumer would believe that they may as well proceed to "sign-in," even if they

12

understand, in spite what the language actually says, that signing-in denotes acceptance. This interpretation is consistent with (the accurate) consumer expectation that they are powerless in dealings with large corporations, and that these agreements are a game of "gotcha."

Another objectively reasonable interpretation of LN/TM's formulation is that acceptance is denoted *only* by clicking on the TOU link itself. It would be entirely reasonable, and indeed, intuitive, for consumers to believe that they can avoid agreeing to a contract by not accessing it, and proceeding directly to sign-in. In the absence of an express explanation that signing-in means accepting the terms, it would be logical to believe that "continuing past" means accessing the TOU *via* the link, with the expectation that the TOU itself would provide some mechanism for actual signature, or an analogue to a signature, which is what most contracts require.

Moreover, just like in *Arena*, LN/TM's purported mechanism for manifesting assent links to two sets of terms, the TOU, and the Privacy Policy, and the latter does *not* have an arbitration clause, which is important because "[a] reasonable user might well find this arrangement confounding. He or she might not realize the notice contained a second hyperlink." *See Arena*, 2020 WL 1189849, at *4. Reasonable consumers that click on the Privacy Policy link first will understand that they had "continued" past the page that contained the link to the Privacy Policy. If they then notice the TOU link and wish to read the terms to decide whether to agree, they will reasonably believe they are already bound because the conditional "continuing past this page" had already been trigged, and so they may as well complete the transaction.

To reiterate, the standard for inquiry notice is an objective reasonably prudent person standard. *See Nguyen*, 763 F.3d at 1177. Plaintiff need not prove that any particular consumer clicked the other links or continued past before clicking the sign-in page (which, in any event, they must have done, as pages preceding the sign-in page have the buried browse wrap notice). The burden is on LN/TM to prove that clicking the sign-in button

13

objectively manifests assent because of the "continuing past" language preceding it – which they fail to do. By LN/TM's formulation, the acceptance would have been triggered before signing-in, merely by browsing the website, or clicking on any of dozens of links, or even just viewing the terms. LN/TM's purported method of manifesting assent can reasonably be triggered countless ways other than by signing-in (which is not actually identified as a method by which to denote assent), without the intention to agree to the TOU, and cannot therefore be an objective manifestation of assent.

LN/TM (at 9-10) cite cases they say enforced acceptance mechanisms similar to theirs. But in those cases, unlike here, the act required for acceptance was objectively clear. For example, in *Swift v. Zynga Game Network, Inc*., 805 F. Supp. 2d 904, 911 (N.D. Cal. 2011), the website contained "an 'Accept' button directly above a statement that clicking on the button served as assent to the YoVille terms of service." *Id*. at 910-11. In *Saizhang Guan v. Uber Techs., Inc*., 236 F. Supp. 3d 711, 718 (E.D.N.Y. 2017), the defendant required users to literally agree twice: "Uber drivers had to click on a "YES, I AGREE" box twice to indicate assent to Uber's Services Agreement." These instructions are clear that clicking a designated button indicates acceptance of terms. Nor could acceptance of the terms in the agreements at issue in *Swift* and *Saizhang Guan* have been triggered by something other than the designated buttons.

While a "by signing-in" button can work, in the cases LN/TM cites (at 9-10), the company explains expressly that clicking "sign-in" denotes acceptance. In *DeVries v. Experian Info. Solutions, Inc*., No. 16-cv-02953-WHO, 2017 WL 733096, at *5-7 (N.D. Cal. Feb. 24, 2017), there was a "Submit Secure Order" button, and the instruction was that by clicking that button consumers agreed to the TOU. But LN/TM do not say "by signing in you agree to the TOU." In *Fteja v. Facebook, Inc*., 841 F. Supp. 2d 829, 835, 841 (S.D.N.Y. 2012), the assent was shown by the following: "By clicking Sign Up, you are indicating that you have read and agree to the Terms of Service." These cases illustrate precisely what is wrong with LN/TM's formulation, and show that it is very easy to do

what the law demands.

**B.    The Purchase Page Does Not Objectively Evidence Assent**

LN/TM argue (at 5) that Plaintiff Terry-Bazer also accepted the TOU because of a link on the Ticketmaster purchase page. The LN/TM purchase page mechanism is even more confounding than the sign-in page, stating: "By continuing past this page and clicking 'Place Order,' you agree to our Terms of Use." ECF No. 61 at 5. By LN/TM's own terms, clicking "Place Order" is insufficient; the consumer must both "Place Order" "and" continue past the page, which must mean something other than "Place Order," or it would have said only "Place Order." Plaintiff Terry-Bazer, by LN/TM's own instruction, did not agree to the TOU by placing her order for tickets.

The language on the purchase page, moreover, further supports the preceding argument regarding the sign-in page, that rather than objectively evidencing assent, "continuing past this page" is too confusing to evidence anything other than LN/TM's unwillingness to clearly instruct consumers on how to accept the TOU.

LN/TM has not met its burden: none of the notices are sufficiently visible, and the notices are doomed by their hopelessly confusing, and imprecise instruction on what exactly must be done to agree to the TOU.

LN/TM request the Court send this case to arbitration in spite of their use of tiny weblinks to a dense legal agreement, of the type everyone knows consumers do not read, and would not understand even if they did read it. The Court should apply the same exactitude to LN/TM's own words.

**4.    LN/TM's Use of  Varied and Multiple Notices Tricks Consumers**

LN/TM argue that Plaintiff Terry-Bazer agreed to be bound by all or at least one of the three ways discussed above. But the Court should not look at these different pages in isolation because that is not how consumers encounter them: they start on one page (usually the homepage) and proceed from there, browsing for what they want, with each page

PLAINTIFF TERRY-BAZER'S OPPOSITION TO THE TICKETMASTER DEFENDANTS' MOTION TO COMPEL ARBITRATION

containing dozens, if not hundreds, of links, link graphics, photos and other content. The Court should consider the totality of the user experience. *Applebaum*, 263 F. Supp. 3d at 466 ("Evaluating the totality of the circumstances, a reasonably prudent consumer would not have been on inquiry notice of the terms of the February 8, 2016 Terms of Service.").

In totality, and, contrary to what LN/TM argue (at 11, n.3), including notices on every page in different spots and of varying (but always insufficient), prominence does not mean inquiry notice is all the more likely to work at least once. The opposite is true: a consumer will miss the invisible footer on the Ticketmaster homepage and will keep navigating the site. If by chance they stumble over the notice telling them that by continuing they agree to the TOU, any reasonably prudent consumer would realize (correctly) that they had been "continuing" all along, and that the current notice must be the umpteenth notice they passed, and conclude reasonably (but legally incorrectly) that they had already agreed, so they may as well continue to browse the website, or proceed with the transaction.

Repetition of consistently visible notices of terms coupled with the requisite instruction on acceptance (which numerous companies manage to implement) can reinforce informed assent. But the decision by a consumer to "continue" or to "sign in" or to "place order" after an untold number of encounters with instructions for manifesting assent that can be triggered without any intent to agree to terms, including by merely viewing the terms, does not logically denote acceptance. Under such circumstances, continuing is no less likely to denote the reasonable (but legally incorrect) understanding that it is too late to decline.  LN/TM has failed to prove that any one of its notices meets the requisite legal standard.  Placing a multiplicity of defective notices on different webpages does not alleviate the deficiencies; it compounds them.

### 5.   <u>LN/TM's Arbitration Clause Violates JAMS's Rules</u>

LN/TM's arbitration clause designates JAMS as the arbitral forum: "[t]he arbitration will be conducted by JAMS under its Streamlined Arbitration Rules and Procedures or, if applicable, its Comprehensive Arbitration Rules and Procedures, and any applicable

supplemental rules including its Consumer Arbitration Standards of Minimum Fairness." Yagman Decl. Ex. B at ¶ 17.

LN/TM's arbitration clause fails to meet JAMS's Consumer Minimum Standards, compliance with which is a prerequisite for JAMS to preside over a consumer arbitration. The Minimum Standards require that, "[t]he consumer must be given notice of the arbitration clause. Its existence, terms, conditions and implications must be clear," and further that "[t]he clause or procedures must not discourage the use of counsel." *See* Yagman Decl. Ex. C at ¶ 2. LN/TM's agreement violates these requirements.

To begin with, LN/TM never explains what arbitration *is*. Arbitration is not embedded in the consciousness of consumers in the same way that lawsuits are, which is why JAMS requires that the terms, conditions, and implications of arbitration must be made clear to consumers. LN/TM fail to do this.  What is worse, several provisions in the TOU affirmatively promote the notion that consumers cannot be represented by their own lawyers in arbitration, for example:

> We each agree that the arbitrator may not consolidate more than one person's claims and **may not otherwise preside over any form of a representative** or class proceeding, and that any dispute resolution proceedings will be conducted only on an individual basis and not in a class, consolidated or representative action.

Yagman Decl. at Ex. B at ¶17 (emphasis added). The reasonably prudent person knows lawyers "represent" people in court. To say that an arbitrator cannot preside over a "representative" action is to imply to reasonable non-lawyers that they cannot be "represented" by counsel -- a conclusion strongly reinforced by the entirety of the arbitration clause which, despite not defining arbitration, makes it seem very different from a lawsuit by, for example, stating that "[t] here is no judge or jury in arbitration, and court review of an arbitration award is limited." *Id*.

To initiate an arbitration, consumers are instructed to send their claim  to LN/TM's general counsel, using JAMS forms:

> To begin an arbitration proceeding, you must send a letter requesting arbitration and describing your claim to: Live Nation Entertainment, Inc., 9348 Civic Center Drive, Beverly Hills, CA 90210, Attn: General Counsel. You may download the forms located at http://www.jamsadr.com. The arbitration will be conducted by JAMS under its Streamlined Arbitration Rules and Procedures or, if applicable, its Comprehensive Arbitration Rules and Procedures, and any applicable supplemental rules including its Consumer Arbitration Standards of Minimum Fairness. The JAMS Rules are available online at http://www.jamsadr.com or by calling (800) 352-5267 . . . We will automatically reimburse administration and arbitrator fees for claims totaling less than $10,000 regardless of who the prevailing party is (unless the arbitrator determines the claims are frivolous), but we will not pay for attorneys' fees unless ordered to do so by the arbitrator.

*Id*. No suggestion is made that consumers can, or should, do any of the foregoing through their own lawyer, and requesting that the claims be sent to LN/TM's general counsel only misleads consumers further about the nature of arbitration.

Besides ordering consumers to send their claims to LN/TM's general counsel, the only other mention of attorneys on LN/TM's website states that LN/TM "will not pay for attorneys' fees unless ordered to do so by the arbitrator." Yagman Decl. at Ex. B. It is far from objectively clear that this refers to a lawyer a consumer would hire. Given the preceding reference to LN/TM's counsel, a more objectively reasonable and intuitive interpretation is that there will be no reimbursement of LN/TM's attorneys' fee, and that *consumers* are expected to pay LN/TM's general counsel for helping them resolve their dispute. This would discourage consumers from proceeding with arbitration. To reiterate, there is no explanation that arbitration is an adversarial process. To the contrary, consumers are instructed to resolve their disputes by sending forms to LN/TM's general counsel.

The instructions, moreover, are ambiguous and conflicting: is the arbitration initiated by requesting arbitration from LN/TM, or filing online with JAMS? The link to JAMS only further confuses the consumer. For one, the link is to the JAMS home page

1    (https://www.jamsadr.com), which does not use the word "arbitration."

2       The forms are not on the homepage. To find them requires clicking through 5 pages,

3 and that assumes the consumer knows that "ADR Services" (the first link in the chain to

4 the forms) include arbitration; LN/TM does not explain that arbitration is a form of ADR.[7]

5 "ADR Services" opens a dropdown menu with several dozen other links, including one for

6 "Arbitration (North America)," which is a page touting the "JAMS Arbitration

7 Advantages," a sales pitch to companies explaining why they should choose JAMS as their

8 arbitral forum. The most likely and reasonable reaction from consumers would be to

9 assume they are not on the right track. However, they may notice on the right side bottom

10 of that page is a link that finally explains what arbitration is, and that page has a link (among

11 many other links) to "Arbitration Forms," which includes a link (among many other links)

12 for "Demand for Arbitration" forms. However, JAMS's instructions on that link conflicts

13 with LN/TM's instruction to send the forms directly to the general counsel: "Please submit

14 this form to your local JAMS Resolution Center. Once the below items are received, a

15 JAMS professional will contact all parties to commence and coordinate the arbitration

16 process . . . ."  The forms require that consumers persevere through 5 pages of unfamiliar

17 legal jargon and irrelevant content, and, if the finish line is reached, the instructions there

18 conflict with what LN/TM stated previously.

19       In sum, LN/TM's agreement discourages the use of counsel, confuses consumers

20 about the adversarial nature of arbitration, and presents a conflicting procedure for

21 initiating arbitration. The Court should not send this case to JAMS, because by LN/TM's

22 own agreement, which incorporates JAMS's own rules, the arbitration clause does not meet

23 the Consumer Arbitration Standards of Minimum Fairness.

24                       **CONCLUSION**

25       For all the aforementioned reasons, Plaintiff Terry-Bazer respectfully requests that

26

27    ―――――――――――――――
[7] The relevant JAMS webpages are attached as Exhibits D-H, respectively, to the Yagman Decl.

28                             19

1  Ticketmaster Defendants' motion be denied in its entirety.

2

3  DATED:  July 31, 2020              Respectfully submitted,

4

5                                    **MILBERG PHILLIPS GROSSMAN LLP**

6

7                                    */s/ David Azar*
                                     David Azar (State Bar No. 218319)
8                                    16755 Von Karman Avenue, Suite 200
                                     Irvine, California 92606
9                                    Telephone: 212-594-5300
                                     Email:      dazar@milberg.com
10

11
                                     Marc Grossman (*pro hac* admitted)
12                                   Peggy Wedgworth (*pro hac* admitted)
                                     Andrei Rado (*pro hac* forthcoming)
13                                   Kent Bronson (*pro hac* forthcoming)
                                     Blake Yagman (*pro hac* admitted*)*
14                                   Michael Acciavatti (*pro hac* admitted)
15                                   **MILBERG PHILLIPS GROSSMAN LLP**
                                     One Pennsylvania Plaza, Suite 1920
16                                   New York, New York 10119
                                     Telephone: 212-594-5300
17                                   E-mail:     mgrossman@milberg.com
18                                               pwedgworth@milberg.com
                                                 arado@milberg.com
19                                               kbronson@milberg.com
                                                 byagman@milberg.com
20                                               macciavatti@milberg.com
21

22
                                     *Attorneys for Plaintiff and the Potential Class*
23

24

25

26

27

28

PLAINTIFF TERRY-BAZER'S OPPOSITION TO THE TICKETMASTER DEFENDANTS'
MOTION TO COMPEL ARBITRATION