**MILBERG PHILLIPS GROSSMAN LLP**
David Azar (State Bar No. 218319)
16755 Von Karman Avenue, Suite 200
Irvine, California 92606
Telephone:  212-594-5300
Email:      dazar@milberg.com

*Attorney for Plaintiffs & Proposed Classes*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA WESTERN DIVISION

| | |
|---|---|
| MATTHEW AJZENMAN; SUSAN TERRY-BAZER; BENNY WONG; ALEX CANELA; JEREMY WOOLLEY; AMANDA WOOLLEY; ANNE BERGER; and KRYSTAL MOYER, on behalf of themselves, and all others who are similarly situated,<br><br>                   Plaintiffs,<br>v.<br><br>OFFICE OF THE COMMISSIONER OF BASEBALL, an unincorporated association doing business as MAJOR LEAGUE BASEBALL, *et al.*,<br><br>                  Defendants. | CASE NO. 2:20-cv-03643-DSF-(JEMx)<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO TICKETMASTER AND LIVE NATION'S MOTION TO DISMISS**<br><br>Date:   September 14, 2020<br>Time:  1:30 p.m.<br>Place:  Courtroom 7D<br>Judge:  Honorable Dale S. Fischer |

# **TABLE OF CONTENTS**

**PRELIMINARY STATEMENT AND BACKGROUND**………………………….....1

**LEGAL STANDARD** .................................................................................. 6

**ARGUMENT**

I.   PLAINTIFFS STATE DIRECT CLAIMS AGAINST LN/TM………………….7

    A. The "Non-Purchasing" Plaintiffs Have Viable Claims
       Against LN/TM Because They Have Properly Alleged
       A Civil Conspiracy ................................................................ 7

    B. Plaintiffs' Claims and Allegations Do Not "Sound in Fraud,"
       and are Not Subject to the Heightened Demands of Rule 9(b);
       Even if They Were, They are Sufficiently Detailed to Satisfy Rule 9(b) .......... 11

II.  TICKETMASTER'S MISCONDUCT AND STATEMENTS
    ARE IMPUTABLE TO THE LIVE NATION ENTITIES,
    AND PLAINTIFFS STATE VIABLE CLAIMS AGAINST LN/TM ................... 13

III. PLAINTIFFS PROPERLY ALLEGE CLAIMS UNDER CLRA,
    UCL AND FOR UNJUST ENRICHMENT .......................................... 17

    A. Plaintiffs Properly Plead CLR and UCL Claims ............................... 17

    B. Plaintiffs Plead Viable Unjust Enrichment Claims ........................... 19

IV.  LEAVE TO REPLEAD ................................................................ 20

**CONCLUSION**.................................................................................. 20

i

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. SeaWorld Parks & Entm't, Inc.,* No. 15-cv-02172-JSW,
   2016 U.S. Dist. LEXIS 188044 (N.D. Cal. Nov. 7, 2016). .......................17, 18, 19, 25

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.,*
   869 P.2d 454 (1994) ....................................................................... 8, 10

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ......................................................................... 6, 7

*Astiana v. Hain Celestial Grp.,*
   783 F.3d 753 (9th Cir. 2015) ............................................................... 19

*AT&T Co. v. Compagnie Bruxelles Lambert,*
   94 F.3d 586 (9th Cir. 1996) ................................................................ 14

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544, 570 (2007) .................................................................. 6, 7

*Bly-Magee v. Cal.,*
   236 F.3d 1014 (9th Cir. 2001) .............................................................. 12

*Cal. Ass'n of Psychology Providers v. Rank,*
   793 P.2d 2 (1991) ............................................................................ 18

*Calvert v. Huckins,*
   875 F. Supp. 674 (E.D. Cal. 1995) ......................................................... 14

*Cooper v. Pickett,*
   137 F.3d 616 (9th Cir. 1997) ............................................................... 12

*Fairbanks v. Super. Ct.,*
   205 P.3d 201 (2009) ......................................................................... 18

*Hall v. SeaWorld Entm't, Inc.,*
   No. 3:15–CV–660–CAB–RBB, 2015 WL 9659911 (S.D. Cal. 2015) ....................... 17

*Hinds Cnty. v. Wachovia Bank N.A.,*
   708 F. Supp. 2d 348 (S.D.N.Y. Apr. 26, 2010) ........................................... 15

i

*In re KF Dairies, Inc. & Affiliates*,
   224 F.3d 922 (9th Cir. 2000) ...................................................................... 19

*Keffer v. H.K. Porter, Co.*,
   872 F.2d 60 (4th Cir. 1989) ......................................................................... 14

*Kidron v. Movie Acquisition Corp.*,
   47 Cal. Rptr. 2d 752 (1995) ........................................................................... 9

*Lee v. City of L.A.*,
   250 F.3d 668 (9th Cir. 2001) ....................................................................... 16

*N. Star Int'l v. Ariz. Corp. Comm'n*,
   720 F.2d 578 (9th Cir. 1983) ......................................................................... 6

*Olenicoff v. UBS AG,* No. SACV 08–1029 AG (RNBx),
   2010 WL 8530286 (C.D. Cal. Mar. 16, 2010) ........................................... 9, 10

*Orgain, Inc. v. N. Innovations Holding Corp.*,
   18-cv-01253-JLS-ADS, 2018 WL 7504409 (C.D. Cal. Dec. 6, 2018) ................ 11, 12

*People ex rel. Kennedy v. Beaumont Inv., Ltd.*,
   3 Cal. Rptr. 3d 429 (2003) .............................................................................. 9

*People v. Tierney*,
   61 Cal. Rptr. 164 (1967) ............................................................................... 10

*Scheuer v. Rhodes* (*In re Daou Sys.*),
   416 U.S. 232, 236 (1974) ................................................................................ 7

*Sparling v. Daou (In re Daou Sys.)*,
   411 F.3d 1006 (9th Cir. 2005) ...................................................................... 20

*Vess v. Ciba-Geigy Corp. USA*,
   317 F.3d 1097 (9th Cir. 2003) ...................................................................... 11

*Wochos v. Tesla, Inc.*,  No. 17-cv-05828-CRB,
   2018 U.S. Dist. LEXIS 145696 (N.D. Ca. Aug. 27, 2018) ......................... 15

*Wyatt v. Union Mortg. Co.,* ........................................................................ 10, 12
   598 P.2d 45, 51  (1979)

ii

*Yamauchi v. Cotterman*,
    84 F. Supp. 3d 993  (N.D. Cal. 2015) ........................................................... 16

**Statute**

55 Cal. Jur. 3d Restitution § 2 ........................................................... 19

**Other**

Fed R. Evid. 201(b) ........................................................... 17
Fed R. Civ. P. 8(a) ........................................................... *passim*
Fed R. Civ. P. 9(b) ........................................................... 11, 12
Fed R. Civ. P. 12(b)(6) ........................................................... 6, 7
Fed R. Civ. P. 15(a)(2) ........................................................... 20

iii

## PRELIMINARY STATEMENT AND BACKGROUND

Plaintiffs Matthew Ajzenman; Benny Wong; Alex Canela; Jeremy Woolley; Amanda Woolley; Anne Berger; and Krystal Moyer (collectively, "Plaintiffs") respectfully submit this opposition to the motion to dismiss of Defendants Ticketmaster LLC; Live Nation Worldwide, Inc., and Live Nation Entertainment, Inc. (collectively the "Ticketmaster Defendants" and/or "LN/TM").  The operative complaint in this action is the Corrected Amended Class Action Complaint ("Complaint" or "Compl.") (ECF No. 16). The Complaint alleges claims pursuant to (i) California's Unfair Competition Law,  Bus. & Prof. Code § 17200, *et seq*.; (ii) California's Consumer Legal Remedies Act, Cal. Civ. Code §1750, *et seq*.; (iii) civil conspiracy; and (iv) for unjust enrichment, against the Ticketmaster Defendants, StubHub, Inc. and Last Minute Transactions, Inc. (collectively with the Ticketmaster Defendants, the "MLB Ticket Merchants"), the Office of the Commissioner of Baseball (d/b/a Major League Baseball) ("Major League Baseball" or "MLB"), and the thirty Teams comprising MLB and certain affiliates thereof (referred to hereinafter as the "Teams" or the "Team Defendants").

This case was filed due to Defendants' concerted and joint refusal to refund monies to purchasers of game tickets for the 2020 MLB season. Prior to the onset of the regularly scheduled 2020 MLB regular season, each named Plaintiff purchased tickets to attend baseball games for that upcoming season. Compl. ¶¶ 9-31. These tickets are unusable because, as a result of the Novel Coronavirus global pandemic ("COVID-19"), no MLB games have been or will be played for the 2020 MLB regular season as originally scheduled. *E.g.*, Compl. ¶¶ 1, 88.

It became clear on March 12, 2020, at the latest, that the MLB season would not be played as intended, when MLB Commissioner Manfred cancelled the remainder of spring training and reportedly postponed the start of the MLB season by two weeks due to COVID-19. *Id.* ¶ 75. In the four-plus months since then, hundreds of thousands of

1

Americans have died,[1] millions have lost their jobs,[2] and the vast majority of Americans have experienced increased stress (physically, mentally, and/or financially) as a result of COVID-19.  The 2020 MLB season landscape was fundamentally altered due to the persistence and spread of the COVID-19 pandemic, and in June 2020, the entire 2020 MLB season was euphemistically "rescheduled" after COVID-19 had already long-since rendered the initial schedule completely unplayable, and each of the tickets purchased by Plaintiffs and other Class members completely useless.  Even so, by then full refunds still had not been given by Defendants LN/TM. In fact, the "modified" schedule for MLB began just prior to submission of this brief (on July 24, 2020), and by then still there were no full refunds on a Class-wide basis, and none at all by LN/TM.  Games ostensibly described as "regular season" have just begun, but as now packaged do not remotely resemble the season/games for which fans purchased tickets. The "season" is scheduled for 60 instead of the usual 162 games, and without live fan attendance.[3]

All Defendants, by both affirmative conduct and inaction, have offended public policy and established consumer rights and protections in California and elsewhere.  For months, ticketholders were unfairly held in limbo by MLB's self-serving and inconsistent directives while Defendants played "keep-away" games with fans, with MLB directing Teams and Ticket Merchants to not issue refunds at all. *See, e.g*, Compl. ¶¶ 1, 2-3, 9-31, 79-98.  Only after Plaintiffs filed suit in April 2020 did the MLB or the Teams take any

---

[1] Joel Achenbach, William Kan, Karin Brulliard, and Chelsea Janes, *The crisis that shocked the world: America's response to the coronavirus*, THE WASHINGTON POST (July 19, 2020), https://www.washingtonpost.com/health/2020/07/19/coronavirus-us-failure/.

[2] Melissa Holzberg and Ben Kamisar, *Americans concerned about economic impact as coronavirus cases surge*, NBC NEWS (Updated July 22, 2020) https://www.nbcnews.com/politics/2020-election/americans-concerned-about-economic-impact-coronavirus-cases-surge-n1234396.

[3] Andrew Simon, *MLB's 60-game schedule for 2020 unveiled*, MLB.COM (July 6, 2020), https://www.mlb.com/news/2020-major-league-baseball-schedule-released.

action, prompting a second MLB directive to individual Teams as to their authority over refunds.  Compl. ¶ 3.[4]  This prompted a cascade of varying, often consumer-hostile Team policies in late April/early May and more chaos, frustration and deprivation for ticketholders, with only offers of refunds (or in many instances only "credits") to Class members on a piecemeal, partial, inconsistent basis, to serve the financial interests of the Defendants at the expense of the Class.  More pertinent to this motion, LN/TM has failed to retain or implement fair, adequate or reasonable refund policies to make Class members whole, and apparently changed its policies in reaction to the COVID-19 specifically to deny refunds for games not formally cancelled. *See, e.g.*, *id* ¶¶ 93-95.[5]

It is truly remarkable that during this unprecedented time of crisis for average Americans, including passionate and loyal baseball fans, LN/TM has persisted in refusing to do right by its consumers (those fans) and make them whole with full and automatic refunds.  Compl. ¶¶ 2, 93-95.  Instead, LN/TM kept a tight grip on its ticket sale proceeds by continually playing games with refund policies, and offering only cagey and shifting acknowledgements, statements and actions about the status of the 2020 season.  *E.g,* Compl. ¶¶ 93-96 and n.73.  These are hardly trivial matters to MLB ticketholders, for many of whom even the value of moderately-priced tickets are meaningful in this time of severe economic stress and prolonged uncertainty.

LN/TM has been nothing if not inventive with its shifting approach to avoid giving refunds. It persisted in refusing to admit that hundreds of MLB games, which by all realistic

---

[4] *See also* Randy Miller, *Is fans' lawsuit scaring MLB? Teams finally permitted to refund ticket money*, NJ.COM (Apr. 29, 2020), https://www.nj.com/yankees/2020/04/is-fans-lawsuit-scaring-mlb-teams-finally-permitted-to-refund-ticket-money.html.

[5] LN/TM's refusal to refund for events affected by COVID-19 goes beyond sporting events. Two additional class actions are pending against LN/TM for failure to refund events impacted by COVID-19. *See Hansen v. Ticketmaster Entm't Inc. et. al.,* No. 3:20-cv-02685 (N.D. Cal., Apr. 17, 2020); *Tezak v. Live Nation Entm't, Inc.*, et al., No. 1:20-cv-02482 (N.D. Ill., Apr. 23, 2020).

PLAINTIFFS' OPPOSITION TO THE TICKETMASTER DEFENDANTS'
MOTION TO DISMISS

indications would not be played at all or played without live fans, were *de facto* cancelled, apparently to maintain a fiction that they were merely postponed and avoid issuing refunds under its refund policy.  *Id.* Then, LN/TM added a term on its website (shown below) indicating blanket refusal of MLB ticket refunds.  Compl. ¶ 93.

LN/TM's "Terms of Use" ("TOU") (last updated June 25, 2019) purport to govern use of "Live Nation and Ticketmaster's sites and mobile applications" for "purchase, possession, or use of any Live Nation or Ticketmaster tickets, products or services."[6] The TOU incorporate by reference (hyperlink) other policies and guidance including Purchase Policy ("Cancelled and Rescheduled Events") stating:

> If an event is canceled, and you purchased your ticket through Ticketmaster.com, our phone center, or Fan-to-Fan, *we automatically issue you a refund to the credit card, debit card, gift card, or the method of payment used to make your purchase.*[7]

In about mid-March 2020, LN/TM apparently changed its website; while it still allowed refunds for cancelled events (with a 30-day lag), it qualified its policy in that "*Exceptions include MLB and U.S. Open.*"  Compl. ¶ 93.

---

[6] *See* Declaration of Blake Yagman Declaration ("Yagman Decl.") submitted herewith., Ex. A.

[7] *See* Yagman Decl. Ex. B, Purchase Policy, at 2.

Plaintiff Terry-Bazer and other Class members who purchased MLB tickets through LN/TM prior to its change-of-policy obviously were unaware it would change its refund policy vis-a-vis MLB ticket purchases without notice. As Plaintiffs allege, "Class members had no way of knowing that the Defendants had no intention of refunding them in the event [of] a public health [crisis]," Compl. ¶ 124, exactly the type of crisis that LN/TM expressly considered before the fact and about which it warned its stockholders.[8] For LN/TM to warn investors in February 2020 about a "material[] negative[] impact[]" on their business, yet continue to offer full refund policies to ticket-purchasing (and holding) consumers – without warning that it would or might suddenly shove that "material negative" business impact onto the backs of those consumers -- is simply unconscionable.

LN/TM now moves to dismiss the Complaint, on the bases that most of the named Plaintiffs' ticket purchases were not through LN/TM (although they concede the Complaint

---

[8] LN/TM's U.S. Securities and Exchange Commission (SEC) filings warned investors about potential material negative impact to its business and financial results from COVID-19.

PLAINTIFFS' OPPOSITION TO THE TICKETMASTER DEFENDANTS'
MOTION TO DISMISS

1  includes claims by a Plaintiff who purchased through LN/TM);[9] that the Plaintiffs'

2  Complaint and claims "sound in fraud" and is deficient for failing to meet FRCP 9(b)'s

3  heightened pleading requirements; that Plaintiffs' claims and allegations against

4  Ticketmaster are not properly imputed to its Live Nation affiliates; and that Plaintiff's Civil

5  Conspiracy, Unjust Enrichment and CLRA and UCL claims are insufficient on various

6  grounds.

7       For the reasons set forth herein, LN/TM's motion to dismiss should be denied.

8  **LEGAL STANDARD**

9       Motions to dismiss for failure to state a claim "test[s] the legal sufficiency of the

10  complaint." *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). Rule

11  8(a), dictating general rules of pleading, requires a complaint to offer a "short and plain

12  statement of the claim showing that the pleader is entitled to relief," *Ashcroft v. Iqbal*, 556

13  U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)),

14  to give defendant "fair notice" of the claim and "grounds upon which it rests." *Twombly*,

15  550 U.S. at 554-55 (citation omitted). Rule 8 "does not require detailed factual allegations,"

16  only "more than an unadorned, the-defendant-unlawfully-harmed-me accusation[s]."

17  *Iqbal*, 556 U.S. at 678 (citation omitted).

18       Under Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted

19  as true, to state a claim to relief that is plausible on its face." *Id.* Factual plausibility does

20  not require "probability," only greater than a "sheer possibility" of unlawful conduct, and

21

22

---

23  [9] LN/TM's Rule 12(b)(6) motion is ***not*** directed at this Plaintiff, Ms. Terry-Bazer, who purchased six
24  tickets through LN/TM in March 2020 for a Boston Red Sox vs. NY Yankees game scheduled for May
25  2020. *Id.* ¶ 11. Instead, LN/TM has moved to compel arbitration of her claims. *See* ECF No. 61. Plaintiff
    Terry-Bazer is submitting a separate opposition to the motion to compel concurrently with this opposition
25  (ECF No. 82). Should the Court deny LN/TM's motion to compel arbitration as to Ms. Terry-Bazer,
26  LN/TM should either be deemed to have waived its right to move for dismissal as to her claims, or
    alternatively be required to submit a separate motion to dismiss her claims.

27  6

28  PLAINTIFFS' OPPOSITION TO THE TICKETMASTER DEFENDANTS'
MOTION TO DISMISS

is satisfied with "factual content that allows the court to draw [a] reasonable inference" that the defendant is liable for the conduct alleged.  *Id.*

Underlying these standards is the long-accepted maxim that a complaint's factual allegations are taken as true for purposes of a motion to dismiss. *See, e.g., Twombly*, 550 U.S. at 556 (quoting *Neitzke v. Williams,* 490 U.S. 319, 327 (1989) (Rule 12(b)(6) does not allow for a dismissal "based on a judge's disbelief of a complaint's factual allegations") and *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) (Well-pled complaints should proceed even if recovery seems "very remote and unlikely")). Assessing plausibility on a motion to dismiss requires the court to "draw on its judicial experience and commonsense" *Iqbal*, 556 U.S. at 680 (citation and internal quotations omitted). However, the court may not disregard properly pled fact allegations, and a well-pleaded complaint must proceed "even if it strikes a savvy judge that actual proof of those facts is improbable." *Twombly,* 550 U.S. at 556.

## ARGUMENT

### I.   PLAINTIFFS STATE DIRECT CLAIMS AGAINST LN/TM

#### A.   The "Non-Purchasing" Plaintiffs Have Viable Claims Against LN/TM Because They Have Properly Alleged A Civil Conspiracy

LN/TM argues that the claims of Plaintiffs who did not purchase tickets through them have no claim against them. This argument misses the mark because, as explained below, it disregards Plaintiffs' civil conspiracy claim under California law, which includes all Defendants as a part of a conspiracy with respect to ticket refund practices and policies. Plaintiffs adequately and properly allege the existence of a civil conspiracy between *all* of the Defendants (including the Ticket Merchant Defendants, and including LN/TM) to refuse to adequately provide refunds for Class members, who are 2020 MLB regular season ticket purchasers.

7

The Complaint also provides more than sufficient detail concerning the Ticketmaster Defendants'/LN/TM's involvement in this conspiracy, particularly considering that well-pled allegations are to be taken as true on a motion to dismiss.   The Complaint contains detailed allegations that LN/TM has acted and/or is acting at the *direction* of professional sports leagues in determining its refund policies and refusing ticketholder refund requests. *See, e.g.*, Compl. ¶ 95; *see also id.* ¶¶ 93-98.[10]  *See also, e.g.*, Compl. ¶ 131 ("Plaintiffs were harmed by MLB's, MLB Ticket Merchants' and Team Defendants' coordination and cooperation as to a pretext of "postponed" games in order to avoid refunds . . . and each of [Defendants] are responsible for the harm to Plaintiffs and Class members [as] part of a conspiracy to violate California consumer and other laws, . . . ."); *Id.* ¶ 132 (Alleging "agreement, cooperation and coordination by all Defendants [including LN/TM] to avoid refunding money to Class Members . . . in violation of California consumer and other laws.").   Plaintiffs plausibly allege that a civil conspiracy existed, so that each of the tortfeasors share in the liability committed by each of them, and none of the Plaintiffs' claims should be dismissed at the pleading stage merely because some did not purchase from LN/TM. *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.,* 869 P.2d 454, 457 (1994) (*citing Wyatt v. Union Mortg. Co.*, 598 P.2d 45, 51 (1979) ("By participation in a civil conspiracy, a coconspirator effectively adopts as his or her own the torts of other coconspirators within the ambit of the conspiracy.")).

Defendants point out (at 12) that conspiracy is not a stand-alone legal claim and must include an underlying tort, [11] but that is exactly how Plaintiffs have pled it here: a detailed

---

[10] *See also* Compl. ¶ 133 ("[E]ach of the aforementioned Defendants [including LN/TM] lent aid and encouragement and knowingly ratified and adopted the acts of the other.  As a proximate result of the wrongful acts herein alleged, Plaintiffs and the Class members have suffered, and continue to suffer, significant harm.").

[11] LN/TM previewed this and other dismissal arguments in its unsuccessful June 26, 2020 *ex parte* motion to stay discovery (ECF No. 55 at 8-9).  Plaintiffs pointed out the flaws in LN/TM's arguments at that time, and LN/TM has done nothing to remedy them since.

PLAINTIFFS' OPPOSITION TO THE TICKETMASTER DEFENDANTS'
MOTION TO DISMISS

conspiracy involving LN/TM's and other Defendants' decision and agreements/arrangements to act tortuously in violation of consumer laws by, *inter alia*, improperly denying refunds to ticket purchasers, and falsely casting MLB games as "postponed"/ "to be rescheduled" that in reality were and should have been deemed and designated "cancelled," in order to justify denying refunds. *See, e.g., Olenicoff v. UBS AG*, No. SACV 08–1029 AG (RNBx), 2010 WL 8530286, at *30 (C.D. Cal. Mar. 16, 2010) (Rejecting argument that "civil conspiracy claims fail because [it] is not an independent tort[;] Plaintiffs adequately allege other independent claims, such as fraud and . . . RICO, . . . . [A]t the motion to dismiss stage, the Court cannot find that Plaintiffs have failed to state a claim for civil conspiracy [against all Defendants]").

 "[C]ivil conspiracy 'is a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration.'" *Kidron v. Movie Acquisition Corp.*, 47 Cal. Rptr. 2d 752, 757 (1995). California civil conspiracy has three elements: (1) conspiracy formation (agreement to commit wrongful acts); (2) conspiracy operation (commission of wrongful acts); and (3) damage resulting from conspiracy. *People ex rel. Kennedy v. Beaumont Inv., Ltd.*, 111 Cal. App. 4th 102, 3 Cal. Rptr. 3d 429 (2003). As *Kidron* held, defendants concurring in the scheme must have actual knowledge of its unlawfulness, 47 Cal. Rptr. 2d at 758.

All Defendants herein (including LN/TM) tacitly, implicitly and/or explicitly agreed to and did work together to determine whether MLB regular season games would be merely "postponed" or "cancelled," and, in turn, whether and to what extent refund obligations would be triggered. Compl. ¶¶ 96-98. The Complaint cites a major news publication in support of this allegation that cites sources -- including LN/TM employees -- stating no refunds were given for certain professional sports tickets (in that case, National Basketball Association and National Hockey League games) absent permission from the

9

leagues/teams to issue such refunds.  Compl. ¶ 95.  The operation of the alleged conspiracy is clear from the Complaint, which alleges that LN/TM was part of the scheme to deny refunds to MLB ticket purchasers under the pretext that MLB games were postponed rather than cancelled.  *See* Compl. ¶¶ 2, 93-96, 131. This fiction would not have worked absent agreement of all Defendants.  Indeed, had LN/TM disagreed with the other Defendants and given refunds to their customers, the other Defendants would not have been able to maintain the fiction either.   Like most schemes, it was an all-or-none affair, and, accordingly, LN/TM's conduct harmed not only purchasers through its sites, but all other MLB ticket purchasers that did not and have not received refunds.

Plaintiffs also allege LN/TM's knowledge of the wrongfulness of the conspiratorial conduct (*see, e.g.*, Compl. ¶¶ 95-98), which is properly based on inferences from circumstances such as "the nature of the acts done, the relation of the parties and the interests of defendants." *Wyatt*,  598 P.2d 45 at 52  (Those harmed by conspiracy "[are] entitled to damages from those defendants who concurred in the tortious scheme with knowledge of its unlawful purpose.") *Cf.*, *People v. Tierney*, 61 Cal. Rptr. 164, 166-67 (1967) (in criminal conspiracy to violate false advertising and other laws, evidence warranted "the inference that all respondents knew what they were doing was wrong.").

LN/TM claims it merely "provide[s] ticketing services to MLB teams, but [is] not [a] corporate affiliate[] of MLB, [and] [is] not alleged to have any ability to affect MLB's scheduling or cancellation decisions."  Def. Br. at 4.  But just because it could not override MLB's fictional "postponements" did not obligate it to go along with that fiction.  It was free to make its own determinations whether games for which it sold tickets were accurately designated, and also free to make its own determinations whether to issue ticket refunds in any event.  Indeed, this is the gravamen of the conspiracy allegations, which LN/TM effectively admits: it agreed with the other Defendants on the fiction that games were "postponed," to deny refunds on that fictional basis.

10

As such, the Plaintiffs plausibly state the existence of a civil conspiracy under California law, in which each of the tortfeasors share in the liability committed by each and all of them.  Accordingly, none of the Plaintiffs' claims should be dismissed due to LN/TM's overly simplistic "direct purchaser" argument.  *Applied Equip. Corp.*, P.2d 454 at 457(*citing Wyatt,* 598 P.2d at 784).

**B.     Plaintiffs' Claims and Allegations Do Not "Sound in Fraud," and are Not Subject to the Heightened Demands of Rule 9(b); Even if They Were, They are Sufficiently Detailed to Satisfy Rule 9(b)**

LN/TM is wrong to assert that the Complaint "sounds in fraud" and thus necessarily invokes the heightened pleading scrutiny of FRCP Rule 9(b).  Plaintiffs have not pled fraud, thus, Rule 9(b) does not apply.  The Ninth Circuit has specifically recognized, in line with other Circuits, that "in a case where fraud is not an essential element of a claim, only allegations ('averments') of fraudulent conduct must satisfy the heightened pleading requirements of Rule 9(b).  Allegations of non-fraudulent conduct need satisfy only the ordinary notice pleading standards of Rule 8(a)." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1105 (9th Cir. 2003).  This includes CLRA and UCL claims.  For instance, courts have ruled that Cal. Bus. & Prof. Code § 17200 claims do not include fraud as "an essential element," meaning "Plaintiff may plead either fraudulent business acts *or* unfair practices to state a claim . . . . [i]t is clear from the Complaint that Plaintiff has taken the latter course, so '[t]o the extent that [Plaintiff] does not aver fraud, [] his allegations need not satisfy Rule 9(b)." *Orgain, Inc. v. N. Innovations Holding Corp.*, 8:18-cv-01253-JLS-ADS, 2018 WL 7504409, at *6 (C.D. Cal. Dec. 6, 2018) (*citing Vess*, 317 F.3d  at1105) (emphasis omitted)).

As in *Orgain*, Plaintiffs herein plead the UCL claim as "unfair," not necessarily fraudulent.  Compl. ¶ 120.  Additionally, fraud is not an essential element of any of the claims alleged in the Complaint; indeed, the Complaint does not contain the word "fraud" (or any derivative thereof).  Even in cases in which pleadings use the word 'fraud' or

11

1    'fraudulent,' courts do not automatically deem the entire pleading to "sound in fraud," and

2    do not apply Rule 9(b) to all claims.  *See, e.g.*, *Orgain, Inc.*, 2018 WL 7504409, at *6.

3    Because Plaintiffs' claims do not sound in fraud, and the Complaint satisfies Rule 8(a),

4    LN/TM's motion to dismiss should be denied.

5         In any event, assuming for the sake of argument that Rule 9(b) did apply to some or

6    all of the claims in the Complaint, LN/TM's motion to dismiss should still be denied

7    because Complaint's allegations are sufficient to satisfy those heightened pleading

8    standards.  Rule 9(b) mandates that allegations "be 'specific enough to give defendants

9    notice of the particular misconduct . . . so that they can defend against the charge and not

10   just deny" any wrongdoing. *Bly-Magee v. Cal.*, 236 F.3d 1014, 1019 (9th Cir. 2001)

11   (quoting *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993)). Fraud allegations must

12   include the "who, what, when, where, and how" of the claimed bad conduct. *Cooper v.*

13   *Pickett,* 137 F.3d 616, 627 (9th Cir. 1997).

14        The Complaint's allegations adequately meet this pleading standard.  For instance,

15   the Complaint identifies "who" conducted and was involved in the alleged fraudulent

16   misconduct (ticket sellers and resellers, including LN/TM); "what" constituted the wrong

17   (refusal of refunds for tickets purchased);[12] "when" the wrong occurred (commencing just

18   prior to the rise of the COVID-19 pandemic up to and including the time period when the

19   MLB 2020 regular season was set to occur as initially scheduled, and continuing to the

20   present);[13] to the extent applicable in this case, "where" the wrong was carried out (in

21   California and nationwide),[14] and "how" the misconduct occurred (through LN/TM's

22

23   _____

24   [12] *Id.* ¶¶ 93-95.

25   [13] *Id*. ¶ 99.

26   [14] Compl. ¶¶ 6, 8, and ¶¶ 9-98.

27                                          12

28   _____
     PLAINTIFFS' OPPOSITION TO THE TICKETMASTER DEFENDANTS'
     MOTION TO DISMISS

coordinated refusal with other Defendants not to issue refunds, based on the fictional "postponement" of games.).[15]

In addition, contrary to the Ticketmaster Defendants' conclusory and incorrect argument that "no Plaintiff alleges that they relied on *any* misrepresentation about 2020 MLB tickets,"[16] Plaintiffs clearly allege that they and other Class members were deceived by the Defendants' scheme and conduct in acting and persisting in statements as if ticket purchasers would continue to be entitled to full refunds, when in fact Defendants had no intention of providing, or at least knew it that in all likelihood they would not provide, such refunds them in the event of the public health and economic crisis they knew was taking place (*i.e.*, the COVID-19 pandemic). *E.g.*, Compl. ¶ 124.

## II.  TICKETMASTER'S MISCONDUCT AND STATEMENTS ARE IMPUTABLE TO THE LIVE NATION ENTITIES, AND PLAINTIFFS STATE VIABLE CLAIMS AGAINST LN/TM

Under the facts and circumstances herein, all named LN/TM entities are properly alleged to be involved in and should ultimately be held responsible for the misconduct, misstatements and harm caused to any and all of the Plaintiffs and other members of the Classes.   Taking the well-pled allegations in the Complaint as true, and properly considering the totality of the circumstances herein, parent (LN) and subsidiary (TM) are virtually indistinguishable for purposes of this litigation.

The Ticketmaster Defendants' argument for dismissing the Live Nation entities rests on nothing more than a broad assertion of general corporate law principles of stockholder-corporation, and corporate affiliate separateness, in circumstances where that is truly the case.  Def. Br. at 11.  But generalizations do not help LN/TM here, where the LN/TM entities both present and conduct themselves as a single, integrated entity.  Whether the

---

[15] *Id.* ¶ 96

[16] Def. Br. at 9-10.

PLAINTIFFS' OPPOSITION TO THE TICKETMASTER DEFENDANTS'
MOTION TO DISMISS

corporate veil should be pierced is a fact-specific, case-by-case inquiry. *Keffer v. H.K. Porter, Co.*, 872 F.2d 60, 65 (4th Cir. 1989), and a parent and subsidiary are "not really separate entities" and fall within the "alter ego" exception when a prima facie case exists that (1) such "unity of interest and ownership that the separate personalities [of the two entities] no longer exist," and (2) a "failure to disregard [their separate identities] would result in fraud or injustice." *AT&T Co. v. Compagnie Bruxelles Lambert,* 94 F.3d 586, 591 (9th Cir. 1996) (citations omitted). The first prong of this inquiry is alternatively satisfied when a parent controls a subsidiary "to such a degree as to render the latter the mere instrumentality of the former." *Calvert v. Huckins*, 875 F. Supp. 674, 678 (E.D. Cal. 1995).

For purposes of the conduct and issues implicated by this litigation, Ticketmaster and Live Nation are indistinguishable. This identity of interests and conduct is perhaps best established by these Defendants' own words and deeds: both groups of entities are parties to the TOU that LN/TM claims govern the relationship between LN/TM and its customers and the TOU requires legal claims with respect to Copyright Infringement on the Ticketmaster website to be directed to Live Nation Entertainment. The first paragraph of the TOU on the ticketmaster.com website states:

> Welcome! The following are the terms of use ("Terms") that govern your use of Live Nation and Ticketmaster's sites and mobile applications - including but not limited to www.livenation.com, www.ticketmaster.com, www.ticketsnow.com, and www.ticketexchangebyticketmaster.com - (collectively, the "Site"), and your purchase, possession, or use of any Live Nation or Ticketmaster tickets, products, or services.[17]

Live Nation's Board also includes numerous directors who are also long-time senior executive officers at Ticketmaster.[18]

---

[17] Yagman Decl., Ex. A, LN/TM TOU.

[18] For example: Amy Howe (Live Nation Director; Ticketmaster N. A. President; previously Ticketmaster N. A. COO since January 2016), Jared Smith (Live Nation Director; Ticketmaster President; previously

14

A subsidiary is merely an instrumentality of its parent when "a subsidiary's obligations are assumed to be those of the parent, segregation of corporate records, inadequate capitalization, commingling of funds and other assets, whether the subsidiary is operated exclusively in the interest of the parent, and whether the parent and subsidiary consolidate financial statements." *Hinds Cnty. v. Wachovia Bank N.A.,* 708 F. Supp. 2d 348, 367 (S.D.N.Y. Apr. 26, 2010). The facts and circumstances here overwhelmingly indicate that Live Nation and Ticketmaster are one and the same, and the Ticketmaster Entities are at best mere instrumentalities operated completely at the direction and whim of Live Nation. The Ticketmaster entities are wholly-owned subsidiaries of Live Nation Entertainment, Inc., and the companies apparently operate out of the same principal executive offices in Beverly Hills.[19] The companies file consolidated financial reports with the SEC, and the terminology used in those reports confirms the unity of interests and identity of the two groups of entities beyond any doubt. For example, LNE's 2019 Annual Report indicates that Live Nation uses "Ticketmaster" systems to sell sports (and other) tickets suggests that Ticketmaster's assets are commingled with those of Live Nation. *See generally* LN/TM 2019 Annual Report.[20] Live Nation's SEC filings contain a number of

---

Ticketmaster N. A. President since May 2013), and Mark Yovich (Live Nation Director; Ticketmaster Int'l President since 2011). LN/TM 2019 Annual Report at 11.

[19] *See* Yagman Decl., Ex. E at 20 (Select pages from TicketMaster's 2009 Annual Report on Form 10-K filed with the SEC) (TicketMaster's "principal executive offices are those of its parent, Live Nation, located at 9348 Civic Center Drive, Beverly Hills, California . . .").

[20] The Court can and should take judicial notice of and consider these (and other) LN/TM statements in SEC filings. They are not reasonably disputable and are pertinent to the claims and defenses herein. It is well-established in the Ninth Circuit that a court may consider certain materials on a motion to dismiss, even if extrinsic to the pleadings, including matters of judicial notice – without converting it into one for summary judgment. *E.g.*, *Wochos v. Tesla, Inc.*, No. 17-cv-05828-CRB, 2018 U.S. Dist. LEXIS 145696, at *4-5 (N.D. Ca. Aug. 27, 2018*) (*citing U.S. v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003)). This includes SEC filings, even if not mentioned in a complaint. "The Court may take judicial notice of facts not reasonably subject and capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Fed R. Evid. 201(b). A filing with the SEC is the type of public record

---

revealing definitions and admissions, including references to "Live Nation" as "the Company," "we," "us" or "our" and "Live Nation Entertainment, Inc. *and its subsidiaries*, . . ."; "Company" defined as "Live Nation Entertainment, Inc. *and subsidiaries*"; and "Ticketmaster" defined as "The Ticketing Business of the Company."  LN/TM 2019 Annual Report at 1-2.  Accordingly, "We," Us" and "Our" is intended to and refers to *both* the Live Nation entities *and* Ticketmaster.  Considering this, any notion of corporate separateness or independence is exposed as pure form-over substance by LN/TM's statements in its 2019 Annual Report:

> ### *Our* Strategy
>
> *Our* strategy is to grow *our* leadership position in live entertainment, promote more shows, sell more tickets and partner with more sponsors, . . .. *We* serve . . . *venues and teams* to secure content and tickets; *we* invest in technology to build innovative products which advance *our* ticketing, advertising and mobile platforms; and *we* are paid by advertisers that want to connect their brands with *our* passionate fan base.
>
> ### *Our* Business
>
> * * * * *
>
> *Ticketing*. *Our* Ticketing segment is primarily an agency business that sells tickets for events on behalf of its clients …  *We* sell tickets for *our* events and also for third-party clients across multiple live event categories, providing ticketing services for ...  *professional sports franchises and leagues*, ... *We* sell tickets through websites, mobile apps, ticket outlets and telephone call centers. ... *Our* Ticketing segment also manages *our* online activities including enhancements to *our* websites and product offerings. Including intersegment revenue, *our* Ticketing business generated $1.5 billion [in 2019], ... which excludes the face value of tickets sold and is net of the fees paid to *our* ticketing clients. Through all of *our* ticketing services, *we* sold 220 million tickets in 2019 on which *we* were paid fees for *our* services. In

---

that comes from a source whose accuracy cannot reasonably be questioned." *Yamauchi v. Cotterman*, 84 F. Supp. 3d 993, n.13 (N.D. Cal. 2015) (taking judicial notice of filed Form 8-K). *See also Lee v. City of L.A.*, 250 F.3d 668, 689-90 (9th Cir. 2001) ("A court may take judicial notice of 'matters of public record' [even beyond the pleadings] without converting a motion to dismiss into a motion summary judgment") (9th Cir. 2001).

---

PLAINTIFFS' OPPOSITION TO THE TICKETMASTER DEFENDANTS'
MOTION TO DISMISS

addition, approximately 267 million tickets were sold using **our** Ticketmaster
systems, . . .

The remainder of the Report (and Live Nation's other SEC filings) is replete with similar
admissions that the Live Nation entities and Ticketmaster are alter egos and cannot
reasonably be separated for purposes of attributing their actions and representations to each
other, or for purposes of this lawsuit.[21]

The LN/TM entities are, and act in concert as, a single enterprise and entity, with
powerful, overarching joint interests and objectives. Moreover, Live Nation both enjoys
and exercises absolute authority, control and discretion over Ticketmaster's activities and
conduct. LN/TM's arguments to the contrary are without merit.

## III.   PLAINTIFFS PROPERLY ALLEGE CLAIMS UNDER THE CLRA, UCL AND FOR UNJUST ENRICHMENT

### A.   Plaintiffs Properly Plead CLR AND UCL Claims

The Plaintiffs allege viable claims under the California Consumer Legal Remedies
Act. LN/TM argues to the contrary,[22] relying on a single case Southern District of
California opinion that Sea World tickets did not qualify as "goods" or "services," an
opinion that is neither dispositive nor accurately represents California law on the subject.
*Hall v. Sea World Entm't, Inc.*, 3:15–CV–660–CAB–RBB, 2015 WL 9659911, at *14-15
(S.D. Cal. 2015). *Hall* stated (without citing relevant legal authority) that "to hold that the
tickets, or more specifically the admission to the parks that the tickets provide, constitute
a service requires a strained an unnatural construction of the term." *Id.* at *15.

Additional relevant authority, is *Anderson v. SeaWorld Parks & Entm't, Inc.*, No.
15-cv-02172-JSW, 2016 U.S. Dist. LEXIS 188044, at *27-28 (N.D. Cal., Nov. 7, 2016),
which "disagree[d], respectfully with [*Hall* and] its reasoning and conclusion." *Anderson*

---

[21] *See also* LN/TM 2019 Annual Report at 4, 34.

[22] Def. Br. at 15-16.

17

correctly recognized that "[t]he California Supreme Court has not addressed whether admission to a theme park like SeaWorld is a "service," and so it:

> must apply 'California law as [it believes] the California Supreme Court would apply it.' *In re KF Dairies, Inc. & Affiliates*, 224 F.3d 922, 924 (9th Cir. 2000). Because this dispute involves the proper interpretation of a statute, the Court begins, as it must, 'with the language of the statute itself.' *United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 241, 109 S. Ct. 1026, 103 L. Ed. 2d 290* (1989). The term 'services' means 'work, labor and services for other than a commercial or business use, in connection with the sale . . . of goods.' The dispute centers on whether the alleged "entertainment and education services" fall within the scope of the phrase "services for other than a commercial or business use." Based on the plain language of the statute, the Court finds that the phrase is broad enough to encompass 'educational and entertainment' services.

*Id.* LN/TM also argues that the CLRA's legislative history indicates that it was not intended to cover transactions involving entertainment or recreation.[23] *Anderson* dispels this notion as well, disagreeing with *Fairbanks*. *Anderson*, 2016 U.S. Dist. LEXIS 188044, at *29 ("As is evident, the *Fairbanks* court neither expressly addressed nor analyzed the phrase 'services for other than a commercial or business use.'"). *Anderson* continued: "[t]he Court 'must interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner than renders other provisions in the same statute inconsistent, meaningless, or superfluous.'" *Id.* (quoting *Boise Cascade Corp. v. U.S. EPA,* 942 F.2d 1427, 1432 (9th Cir. 1991)); *see also Cal. Ass'n of Psychology Providers v. Rank*, 793 P.2d 2, 6 (1991). The *Anderson* Court ultimately ruled that "the term 'services' encompasses the 'educational and entertainment services' [that plaintiff] alleges she purchased from SeaWorld." *Anderson*, 2016 U.S. Dist. LEXIS 188044, at *33.

---

[23] Def. Br. at 15 (*citing Fairbanks v. Super. Ct.*, 205 P.3d 201, 60-61 (2009)).

18

Consistent with *Anderson*'s logic and ruling, MLB game tickets purchased by Class members also plainly fall within the ambit of "goods" and "services" under the CLRA.

LN/TM attempts an extreme leap of legal logic (with no supporting authority, and just a partial sentence) to argue that "the derivative [Unfair Competition Law] claim should be dismissed on this basis as well." Def. Br. at 16. LN/TM offers nothing but this bare conclusion to support dismissal of the UCL claims, and should therefore be deemed to concede the viability of those claims at the pleading stage.

**B.    Plaintiffs Plead Viable Unjust Enrichment Claims**

California courts can and do construe "unjust enrichment" claims as a "quasi-contract claim seeking restitution." *Astiana v. Hain Celestial Grp.,* 783 F.3d 753, 762 (9th Cir. 2015) (quoting *Rutherford Holdings, LLC v. Plaza Del Ray*, 166 Cal. Rptr. 3d 864, 872-73 (2014)). Unjust enrichment as restitution via quasi-contract is generally based on situations in which a defendant wrongfully retains a benefit "through mistake, fraud, coercion, or request." 55 Cal. Jur. 3d Restitution § 2.

Plaintiffs have sufficiently pled the elements of unjust enrichment as restitution via quasi-contract. Plaintiffs allege that the Defendants wrongfully benefitted from money they have wrongfully withheld from ticket purchasers via fraud. *See, gen.* Compl. Specifically, LN/TM has wrongfully retained money from ticket purchasers of MLB tickets by not providing refunds for games that were not played due to COVID-19 and in contravention to LN/TM's Purchase Policy. Yagman Decl., at C. As alleged in the complaint and as argued herein, the Plaintiffs believe this conduct is unfair and, frankly, unconscionable. Thus, Plaintiffs' unjust enrichment claim should be sustained.

## IV.   LEAVE TO REPLEAD

In the event LN/TM's motion is granted in any respect, Plaintiffs respectfully request leave to replead, or alternatively permission to move for such leave under Rule 15(a)(2), which provides for such leave to be "freely given when justice so requires."[24]

## **CONCLUSION**

For the reasons set forth herein, Plaintiffs respectfully submit that the Ticketmaster Defendants Motion to Dismiss should be denied in its entirety.

Date: July 31, 2020                    **MILBERG PHILLIPS GROSSMAN LLP**

_/s/ David Azar_

David Azar (State Bar No. 218319)
16755 Von Karman Avenue, Suite 200
Irvine, California 92606
Telephone: 212-594-5300
Email: dazar@milberg.com

Marc Grossman (_pro hac vice_)
Peggy Wedgworth (_pro hac vice_)
Blake Yagman (_pro hac vice_)
Michael Acciavatti (_pro hac vice)_*
Andrei Rado (_pro hac vice forthcoming_)
Kent Bronson (_pro hac vice forthcoming)_
    *(admitted only in Pennsylvania)
**MILBERG PHILLIPS GROSSMAN LLP**
One Pennsylvania Plaza, Suite 1920
New York, New York 10119
Telephone: 212-594-5300
Email:   mgrossman@milberg.com
            pwedgworth@milberg.com

---

[24] Plaintiffs have amended their pleading just once before, in late April 2020.  In such circumstances courts in this Circuit and elsewhere routinely allow parties to replead. _See, e.g., Sparling v. Daou (In re Daou Sys.),_ 411 F.3d 1006, 1013 (9th Cir. 2005).

20

byagman@milberg.com
macciavatti@milberg.com
arado@milberg.com
kbronson@milberg.com

21