## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW AJZENMAN, et al., Plaintiffs, <br><br> v. <br><br> OFFICE OF THE COMMISSIONER OF BASEBALL d/b/a MAJOR LEAGUE BASEBALL, et al., Defendants. | CV 20-3643 DSF (JEMx) <br><br> Order GRANTING Defendants Ticketmaster L.L.C., Live Nation Entertainment, Inc., and Live Nation Worldwide, Inc.'s Motion to Compel Arbitration (Dkt. 61) |

  Defendants Ticketmaster L.L.C., Live Nation Entertainment, Inc., and Live Nation Worldwide, Inc. (collectively, LN/TM) move to compel arbitration of Plaintiff Susan Terry-Bazer's claims and to dismiss or stay this action pending arbitration. Dkt. 61-1 (Mot.). Terry-Bazer opposes. Dkt. 82 (Opp'n). The Court deems this matter appropriate for decision without oral argument. See Fed. R. Civ. P. 78; Local Rule 7-15. For the reasons stated below, the motion is GRANTED.

### I. BACKGROUND

**A. Present Action**

  The 2020 Major League Baseball (MLB) season was scheduled to begin on March 26, 2020 and run through the first week of October. Dkt. 42 (Corr. Am. Compl.) ¶ 74. Due to COVID-19, on March 12, 2020, MLB Commissioner Robert D. Manfred Jr. postponed the start of the season by two weeks. Id. ¶¶ 33, 75. Four days later, the MLB posted an online announcement that the season would be further postponed to

at least mid-May 2020.  Id. ¶ 76.  At this point, millions of fans had already purchased tickets to 2020 MLB games.  Id. ¶ 75.  Following this announcement, MLB teams posted various updates on ticketing policies online.  Id ¶¶ 77-78.  As of the filing of the Corrected Amended Class Action Complaint, no ticket refunds had been issued to ticketholders because the MLB had yet to formally cancel any games.  Id. ¶ 79.  The MLB had "not issued any refunds during this crisis despite the fact it is virtually impossible that a season can be played because (i) certain dates for games ha[d] already passed; (ii) government and health officials ha[d] indicated that games are not going to be played, and if so, likely without spectators; and (iii) MLB itself has given indications that games will not be rescheduled as usual."  Id. ¶¶ 80.

On April 20, 2020, Plaintiffs – individuals who purchased tickets for MLB 2020 regular season games – brought this action against the MLB, Manfred, 30 baseball teams, LN/TM, and StubHub, Inc. and its affiliate.  Id. ¶¶ 9-72; Dkt. 1.  Ticketmaster is an authorized reseller of MLB tickets.  Corr. Am. Compl. ¶ 67.  As of April 19, 2020, Ticketmaster's website stated that it refused to refund MLB games even if they were canceled.  Id. ¶ 93.  On April 17, 2020, Live Nation Entertainment, Ticketmaster's parent company, issued a statement that it would offer refunds and coupons for canceled and postponed shows.  Id. ¶ 95.  However, Live Nation did not address refunds to ticketholders who purchased 2020 MLB regular season tickets through Ticketmaster.  Id.

Of the eight current named plaintiffs, only one, Plaintiff Susan Terry-Bazer, alleges that she purchased tickets through LN/TM.  Id. ¶ 11.  Terry-Bazer, a resident of New York, purchased six tickets for an MLB game to be played on May 9, 2020 between the New York Yankees and the Boston Red Sox.  Id.  The tickets cost approximately $926.  Id.

Plaintiffs bring this action on behalf of themselves and two putative classes – a class of persons and entities who bought tickets directly from MLB teams and a class of those who purchased tickets from the ticket merchant defendants.  Id. ¶ 99.  Plaintiffs bring claims for violations of California's Consumer Legal Remedies Act and

2

California's Unfair Competition Law, civil conspiracy, and unjust enrichment. Id. ¶¶ 110-137.

**B.    LN/TM's Arbitration Provision**

In purchasing tickets on the Ticketmaster website, users are presented with the Ticketmaster Terms of Use in the following three ways:

*Sign-in Page.* To make a purchase on the Ticketmaster website, a user is required to sign into his or her account. Dkt. 62 (Tobias Decl.) ¶ 4. The sign-in page presents a pop-up screen in which a user must enter her email address and password. Id. Directly above the "Sign in" button, the screen states: "By continuing past this page, you agree to the Terms of Use and understand that information will be used as described in our Privacy Policy." Id. The words "Terms of Use" and "Privacy Policy" are in bolded blue text and hyperlinked to the full policies. Id. The sign-in page has had this or similar language about the Terms of Use since at least 2010. Id. ¶ 5

*Purchase Page*. When purchasing tickets on the Ticketmaster website, users arrive at a "Payment" page in which they enter their payment information (such as a credit card number and billing address). Id. ¶ 6; Dkt. 62-2 (Tobias Decl. Ex. 2). Once a user has filled in that information, she presses a "Place Order" button to complete her purchase. Tobias Decl. Ex. 2. Directly above the "Place Order" button, the page states: "By continuing past this page and clicking "Place Order," you agree to our Terms of Use." Id. The words "Terms of Use" are in bolded blue text and hyperlinked to the full text of the Terms of Use. Id.; Tobias Decl. ¶ 6. The purchase page has had this or similar language about the Terms of Use since at least 2006. Tobias Decl. ¶ 7.

*Ticketmaster Website*. Many pages of the Ticketmaster website, including the homepage of the website and the seat selection page for events, contain a link across the bottom of the page that reads: "By continuing past this page, you agree to our Terms of Use." Id. ¶ 8. The words "Terms of Use" are bolded and hyperlinked to the full text of the

Terms of Use.  Id.  This or similar language has been included on the site since at least 2007.  Id.

Each of these notices was in place in March 2020 when Terry-Bazer purchased her tickets.  Tobias Decl. ¶¶ 4, 6, 8; Dkt. 63 ¶ 5.

Ticketmaster's Terms of Use include an arbitration agreement (Arbitration Provision).  Tobias Decl. ¶ 10; Dkt. 62-5 (Tobias Decl. Ex. 5) at 18, 22-23.

## II. LEGAL STANDARD

"[T]he Federal Arbitration Act (FAA) makes agreements to arbitrate 'valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 336 (2011) (quoting 9 U.S.C. § 2).  "By its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 218 (1985); see also Lifescan, Inc. v. Premier Diabetic Servs., Inc., 363 F.3d 1010, 1012 (9th Cir. 2004) (If a valid arbitration agreement exists, "the court must order the parties to proceed to arbitration . . . in accordance with the terms of their agreement."). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Ferguson v. Corinthian Colls., Inc., 733 F.3d 928, 938 (9th Cir. 2013) (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983)).

Generally, a court's role under the FAA is limited to determining "two 'gateway' issues: (1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute." Brennan v. Opus Bank, 796 F.3d 1125, 1130 (9th Cir. 2015) (citing Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 84 (2002)).

4

## III. DISCUSSION

LN/TM moves to compel arbitration on the grounds that Terry-Bazer agreed to submit any claims against Ticketmaster to binding arbitration under the Ticketmaster Terms of Use.

When deciding whether there is an agreement to arbitrate, courts generally "apply ordinary state-law principles that govern the formation of contracts." First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995). Where "the parties contest the *existence* of an arbitration agreement, the presumption in favor of arbitrability does not apply." Goldman, Sachs & Co. v. City of Reno, 747 F.3d 733, 742 (9th Cir. 2014). Under California law, "[a]n essential element of any contract is the consent of the parties." Donovan v. RRL Corp., 26 Cal. 4th 261, 270 (2001), as modified (Sept. 12, 2001). "Courts must determine whether the outward manifestations of consent would lead a reasonable person to believe the offeree has assented to the agreement." Norcia v. Samsung Telecomms. Am., LLC, 845 F.3d 1279, 1284 (9th Cir. 2017) (quoting Knutson v. Sirius XM Radio Inc., 771 F.3d 559, 565 (9th Cir. 2014)).

Terry-Bazer argues that there is no valid arbitration agreement because (1) she was not on proper notice of LN/TM's Terms of Use and (2) LN/TM's Arbitration Provision violates JAMS's standards.

### A. Notice of the Terms of Use

As the Ninth Circuit has explained, "[c]ontracts formed on the Internet come primarily in two flavors":

> "[C]lickwrap" (or "click-through") agreements, in which website users are required to click on an "I agree" box after being presented with a list of terms and conditions of use; and "browsewrap" agreements, where a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen.

Nguyen v. Barnes & Noble Inc., 763 F.3d 1171, 1175-76 (9th Cir. 2014) (citing Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 428-30 (2d Cir.

2004)). "[T]he validity of the browsewrap contract depends on whether the user has actual or constructive knowledge of a website's terms and conditions." Id. at 1176 (quoting Van Tassell v. United Mktg. Grp., LLC, 795 F. Supp. 2d 770, 790 (N.D. Ill. 2011)). "[W]here the website contains an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound, courts have been more amenable to enforcing browsewrap agreements." Id. at 1177. "Courts have also been more willing to find the requisite notice for constructive assent where the browsewrap agreement resembles a clickwrap agreement – that is, where the user is required to affirmatively acknowledge the agreement before proceeding with use of the website." Id. at 1176.

Under these definitions, Ticketmaster's general website notice is a traditional "browsewrap" agreement while its sign-in and purchase pages are the hybrid between the two that Nguyen contemplates. See also Lee v. Ticketmaster L.L.C., 817 F. App'x 393 (9th Cir. 2020) (noting that Ticketmaster's Terms of Use "do not constitute a browsewrap agreement because they are not merely posted on Ticketmaster's website at the bottom of the screen" but also "do not constitute a true pure-form clickwrap agreement as California courts have construed it"). The Court finds that the sign-in and purchase pages created enforceable agreements, and therefore it need not determine whether the website's general notice at the bottom of some webpages is an enforceable "browsewrap" agreement.

In Lee, a recent unpublished decision, the Ninth Circuit considered whether Ticketmaster's website provided notice of its Terms of Use through its sign-in and purchase pages. 817 F. App'x at 393. The court found that the Terms of Use – which were presented to users in the same way as the ones Terry-Bazer encountered – "provided sufficient notice for constructive assent, and therefore" created "a binding arbitration agreement between" the consumer and Ticketmaster. Id. The plaintiff in Lee used Ticketmaster's website to purchase event tickets. Id. As is the case here, "each time he clicked" both the "Sign In" button and the "Place Order" button, he was presented with either the phrase, "By continuing past this page, you

agree to our Terms of Use," or, "By clicking 'Place Order,' you agree to our Terms of Use.'" Id.  As here, the phrase "'Terms of Use' was displayed in blue font and contained a hyperlink to Ticketmaster's Terms." Id.  Based on these facts the circuit concluded that the plaintiff "validly assented to Ticketmaster's Terms of Use, including the arbitration provision, each time he" clicked both the "Sign In" button and the "Place Order" button.  Id.

Terry-Bazer's brief argument that the Court should not follow the guidance of the Ninth Circuit because Lee is "unpublished and non-precedential, and did not address the same webpages at issue here" is unpersuasive.  Opp'n at 5.  While the decision in Lee is nonprecedential, the Court chooses to follow the guidance the Ninth Circuit has provided.  Additionally, though the pages differ slightly, the Ticketmaster sign-in and purchase pages filed in Lee are almost identical to those here.  See Dkts. 92-3, 92-4, 92-5.  All use the same or similar language and present "Terms of Use" in text that is blue and hyperlinks to the full Terms of Use.

Additionally, one of the decisions Terry-Bazer heavily relies on, Arena v. Intuit Inc., see Opp'n at 9, 13, was recently ordered to arbitration.  See Dohrmann v. Intuit, Inc., No. 20-15466, 2020 WL 4601254, at *1 (9th Cir. Aug. 11, 2020), rev'g Arena v. Intuit Inc., 444 F. Supp. 3d 1086 (N.D. Cal. 2020).  In Dohrmann, like Lee, the Ninth Circuit found that a website user was bound to an arbitration agreement where language about TurboTax's terms of use was produced in blue hyperlinks directly below where users clicked a "Sign In" button.  Id. at *2.

The Court therefore concludes that Terry-Bazer assented to LN/TM's Terms of Use and Arbitration Provision.  The Court also finds that the Arbitration Provision – which extends broadly to "ANY DISPUTE OR CLAIM RELATING IN ANY WAY TO YOUR USE OF THE SITE, OR TO PRODUCTS OR SERVICES SOLD, DISTRIBUTED, ISSUED, OR SERVICED BY US OR THROUGH US,"

Tobias Decl. Ex. 5 at 22 – "covers the dispute" at issue in this action. Brennan, 796 F.3d at 1130.[1]

## B. Violation of JAMS's Standards

Terry-Bazer also contends "LN/TM's arbitration clause fails to meet JAMS's Consumer Minimum Standards, compliance with which is a prerequisite for JAMS to preside over a consumer arbitration." Opp'n at 17. Here, the question of whether the arbitration clause itself is unenforceable is "clearly and unmistakably delegated to [the] arbitrator." See Brennan, 796 F.3d at 1128 (quotation marks omitted); see also Mohamed v. Uber Techs., Inc., 848 F.3d 1201, 1208-09 (9th Cir. 2016) (finding similar language "clearly and unmistakably indicates [the parties'] intent for the arbitrators to decide the threshold question of arbitrability" (alteration in original) (citation omitted)); Aanderud v. Superior Court, 13 Cal. App. 5th 880, 897 (2017) ("[I]t is up to the arbitrator to determine whether this dispute is arbitrable, which includes whether the arbitration provision meets the minimum standards of fairness such that JAMS will administer the arbitration . . . .").

Because the Arbitration Provision gives the arbitrator "exclusive authority to the extent permitted by law to resolve all disputes arising out of or relating to the interpretation, applicability, enforceability, or formation of this Agreement," Tobias Decl. Ex. 5 at 22, the Court may not resolve this dispute.

## IV. CONCLUSION

LN/TM's Motion to Compel Arbitration of Terry-Bazer's claims is GRANTED and Terry-Bazer is ORDERED to submit to arbitration pursuant to the terms of the Arbitration Provision, see 9 U.S.C. § 5, if she wishes to pursue her claims.

Terry-Bazer's claims asserted against LN/TM are STAYED pending resolution of the arbitration. See id. § 3. The parties are to

---

[1] Terry-Bazer does not dispute this point.

file a joint status report every 120 days, with the first report due January 12, 2021. Each report must state on the cover page the date the next report is due. The parties must advise the Court within 30 days of issuance of the final arbitration decision.

   IT IS SO ORDERED.

Date: September 14, 2020            _____

                                                    Dale S. Fischer
                                                    United States District Judge