# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW AJZENMAN, et al., <br>    Plaintiffs, <br><br> v. <br><br> OFFICE OF THE COMMISSIONER OF BASEBALL d/b/a MAJOR LEAGUE BASEBALL, et al., <br>    Defendants. | CV 20-3643 DSF (JEMx) <br><br> Order GRANTING Defendants StubHub, Inc. and Last Minute Transactions, Inc.'s Motion to Compel Arbitration (Dkt. 68) |

    Defendants StubHub, Inc. (StubHub) and Last Minute Transactions, Inc. (LMT) (collectively, StubHub Defendants) move to compel arbitration of Plaintiffs Alex Canela and Amanda Woolley's (StubHub Plaintiffs) claims and to dismiss or stay this action pending arbitration. Dkt. 68 (Mot.). StubHub Plaintiffs oppose. Dkt. 85 (Opp'n). The Court deems this matter appropriate for decision without oral argument. See Fed. R. Civ. P. 78; Local Rule 7-15. For the reasons stated below, the motion is GRANTED.

## I. BACKGROUND

### A.    Present Action

    The 2020 Major League Baseball (MLB) season was scheduled to begin on March 26, 2020 and run through the first week of October. Dkt. 42 (Corr. Am. Compl.) ¶ 74. Due to COVID-19, on March 12, 2020, MLB Commissioner Robert D. Manfred Jr. postponed the start of the season by two weeks. Id. ¶¶ 33, 75. Four days later, the MLB posted an online announcement that the season would be further postponed to

at least mid-May 2020. Id. ¶ 76. At this point, millions of fans had already purchased tickets to 2020 MLB games. Id. ¶ 75. Following this announcement, MLB teams posted various updates on ticketing policies online. Id ¶¶ 77-78. As of the filing of the Corrected Amended Class Action Complaint, no ticket refunds had been issued to ticketholders because the MLB had yet to formally cancel any games. Id. ¶ 79. The MLB had "not issued any refunds during this crisis despite the fact it is virtually impossible that a season can be played because (i) certain dates for games ha[d] already passed; (ii) government and health officials ha[d] indicated that games are not going to be played, and if so, likely without spectators; and (iii) MLB itself has given indications that games will not be rescheduled as usual." Id. ¶¶ 80.

On April 20, 2020, Plaintiffs – individuals who purchased tickets for MLB 2020 regular season games – brought this action against the MLB, Manfred, 30 baseball teams, Ticketmaster L.L.C., Live Nation Entertainment, Inc., Live Nation Worldwide, Inc., and the StubHub Defendants. Id. ¶¶ 9-72; Dkt. 1. StubHub is the "Official Fan-to-Fan Ticket Marketplace of MLB.com and the 30 Teams." Corr. Am. Compl. ¶ 71. LMT is a subsidiary of StubHub and "a party to StubHub's contractual agreement with its customers." Id. ¶ 72.

Of eight current named plaintiffs only two, Plaintiffs Alex Canela and Amanda Woolley, allege that they purchased tickets through the StubHub Defendants. Id. ¶¶ 9-30. Canela, a resident of California, purchased two San Francisco Giants game tickets from StubHub. Id. ¶ 16. The tickets cost approximately $1,600. Id. Woolley, a resident of Wisconsin, purchased two tickets from StubHub to a game between the Milwaukee Brewers and Chicago Cubs. Id. ¶ 18.[1] The tickets cost

---

[1] The Corrected Amended Complaint refers to both Jeremy Woolley and Amanda Woolley purchasing the at-issue tickets from StubHub. See Corr. Am. Compl. ¶ 18. However, Jeremy Woolley does not have a StubHub account, and Amanda Woolley purchased the tickets. Dkt. 69 (Northcutt Decl.) ¶¶ 3, 42.

2

$228.75.  Id.  StubHub as not issued refunds to either Canela or Woolley.  Id. ¶¶ 17, 22.

In mid-March 2020, StubHub changed its refund policy with no notice to consumers.  Id. ¶ 91.  Previously, an event cancellation prompted a full refund from StubHub.  Id.  Under the new policy, StubHub instead offers a 120% site credit once an event has been officially canceled.  Id.

Plaintiffs bring this action on behalf of themselves and two putative classes – a class of persons and entities who bought tickets directly from MLB teams and a class of those who purchased tickets from the ticket merchant defendants.  Id. ¶ 99.  Plaintiffs bring claims for violations of California's Consumer Legal Remedies Act (CLRA) and California's Unfair Competition Law (UCL), civil conspiracy, and unjust enrichment.  Id. ¶¶ 110-137.

**B.     StubHub Defendants' User Agreement**

In purchasing tickets on the StubHub website, users are presented with StubHub's User Agreement in the following four ways:

***User Registration.***  One way to utilize StubHub's services is to create an online account.  Dkt. 69 (Northcutt Decl.) ¶¶ 5, 7.  When a user clicks the "Sign up" link on StubHub's website, she is taken to a screen containing the User Registration Form.  Id. ¶ 6.  The prospective user then enters personal information (e.g., name and email address) and clicks "Sign up" to create an account.  Id. ¶ 13.  Directly below the "Sign up" button, the window states: "By purchasing or signing in, you agree to our user agreement and acknowledge our privacy notice."  Id.  The terms "user agreement" and "privacy notice" are bolded, underlined, in blue font, and hyperlinked to those policies.  Id.  Though it is not necessary for consumers to register as users to purchase tickets on the StubHub website, both Canela and Woolley did in fact register.  Id. ¶ 3. At the time Canela and Woolley "each registered as StubHub users, the words 'user agreement' on the page they each saw were (and still are) hyperlinks in bolded, offset font, that, when clicked, open a separate page that contains the StubHub User Agreement."  Id. ¶ 14.

3

***Sign-In Page.***  When consumers either log in to their StubHub account or purchases tickets to an event, a pop-up screen displays on the website.  Id. ¶ 17.  The screen allows consumers to enter their account information and press the "Sign in" button or, alternatively, select the "Continue as guest" button.  Id.  On the bottom of the pop-up screen is the text: "By purchasing or signing in, you agree to our user agreement and acknowledge our privacy notice."  Id.  The words "user agreement" and "privacy notice" are in blue text and hyperlinked to the applicable notices.  Id.  The notice is separated from the buttons by one line of text.  Id.  This notification was in place when Canela and Woolley purchased their at-issue MLB tickets.  Id. ¶ 18.

***StubHub Website.***  When a consumer accesses the StubHub website, a disclaimer displays at the bottom of numerous StubHub webpages, including the home page and the MLB tickets page, that advises:

> Use of this website signifies your agreement to our User Agreement, Privacy Notice and Cookie Notice.  You are buying tickets from a third party; StubHub is not the ticket seller.  Prices are set by sellers and may be above face value.  User Agreement change notifications.

Id. ¶ 16.  The words "User Agreement," "Privacy Notice and Cookie Notice" and "User Agreement change notifications" are in blue font and hyperlinked to the applicable notices.  Id.

***Email Notification.***  After consumers purchase tickets through StubHub, they receive a confirmation email of the purchase.  The email includes a notice that states:

> This email was sent to [user email address] by StubHub, Inc., 199 Fremont Street, Floor 4, San Francisco CA 94105, USA, which may use affiliates to provide StubHub services.  Please refer to the user agreement for the contact data of your contracting party.  StubHub is committed to your privacy.  Learn more about our privacy notice and user agreement.

4

Id. ¶¶ 39, 44. The terms "user agreement" – both times it appears – and "privacy notice" are in blue, underlined font, and hyperlinked to the applicable policies. Id. Canela and Woolley each received an email with this language after their at-issue purchase. Id.

StubHub's User Agreement contains an arbitration provision. Id. ¶ 32. The versions of the StubHub user agreement in place when Canela and Woolley each registered for StubHub contained substantively identical arbitration language to the current arbitration provision. Id. ¶¶ 31-35.

## II. LEGAL STANDARD

"[T]he Federal Arbitration Act (FAA) makes agreements to arbitrate 'valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 336 (2011) (quoting 9 U.S.C. § 2). "By its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 218 (1985); see also Lifescan, Inc. v. Premier Diabetic Servs., Inc., 363 F.3d 1010, 1012 (9th Cir. 2004) (If a valid arbitration agreement exists, "the court must order the parties to proceed to arbitration . . . in accordance with the terms of their agreement."). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Ferguson v. Corinthian Colls., Inc., 733 F.3d 928, 938 (9th Cir. 2013) (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983)).

Generally, a court's role under the FAA is limited to determining "two 'gateway' issues: (1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute." Brennan v. Opus Bank, 796 F.3d 1125, 1130 (9th Cir. 2015) (citing Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 84 (2002)).

### III. DISCUSSION

StubHub Defendants move to compel arbitration on the grounds that StubHub Plaintiffs agreed to submit any claims against them to binding arbitration under the StubHub User Agreement.

When deciding whether there is an agreement to arbitrate, courts generally "apply ordinary state-law principles that govern the formation of contracts." First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995). Where "the parties contest the *existence* of an arbitration agreement, the presumption in favor of arbitrability does not apply." Goldman, Sachs & Co. v. City of Reno, 747 F.3d 733, 742 (9th Cir. 2014). Under California law, "[a]n essential element of any contract is the consent of the parties." Donovan v. RRL Corp., 26 Cal. 4th 261, 270 (2001), as modified (Sept. 12, 2001). "Courts must determine whether the outward manifestations of consent would lead a reasonable person to believe the offeree has assented to the agreement." Norcia v. Samsung Telecomms. Am., LLC, 845 F.3d 1279, 1284 (9th Cir. 2017) (quoting Knutson v. Sirius XM Radio Inc., 771 F.3d 559, 565 (9th Cir. 2014)).

StubHub Plaintiffs argue that (1) no agreement to arbitrate was formed between the parties and (2) the arbitration provision fails because it "prohibits the remedy of a public injunction." Opp'n at 3-4.

### A. Assent to the User Agreement

As the Ninth Circuit has explained, "[c]ontracts formed on the Internet come primarily in two flavors":

> "[C]lickwrap" (or "click-through") agreements, in which website users are required to click on an "I agree" box after being presented with a list of terms and conditions of use; and "browsewrap" agreements, where a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen.

Nguyen v. Barnes & Noble Inc., 763 F.3d 1171, 1175-76 (9th Cir. 2014) (citing Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 428-30 (2d Cir.

2004)). "[T]he validity of the browsewrap contract depends on whether the user has actual or constructive knowledge of a website's terms and conditions." Id. at 1176 (quoting Van Tassell v. United Mktg. Grp., LLC, 795 F. Supp. 2d 770, 790 (N.D. Ill. 2011)). "[W]here the website contains an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound, courts have been more amenable to enforcing browsewrap agreements." Id. at 1177. "Courts have also been more willing to find the requisite notice for constructive assent where the browsewrap agreement resembles a clickwrap agreement – that is, where the user is required to affirmatively acknowledge the agreement before proceeding with use of the website." Id. at 1176.

Under these definitions, StubHub's general website notice is a traditional "browsewrap" agreement while its sign-up and sign-in pages are the hybrid between the two that Nguyen contemplates. See also Lee v. Ticketmaster L.L.C., 817 F. App'x 393 (9th Cir. 2020) (noting that Ticketmaster's Terms of Use "do not constitute a browsewrap agreement because they are not merely posted on Ticketmaster's website at the bottom of the screen" but also "do not constitute a true pure-form clickwrap agreement as California courts have construed it"). The Court finds that the sign-up and sign-in pages created enforceable agreements, and therefore it need not determine whether the website's general notice or the post-purchase email notice constitute enforceable agreements.

In two recent unpublished decisions, the Ninth Circuit found that language and structure similar to that used by StubHub "provided sufficient notice for constructive assent" and created "a binding arbitration agreement between" the consumer and the ticket seller. In Lee, the plaintiff used Ticketmaster's website to purchase event tickets. Id. "[E]ach time he clicked" both the "Sign In" button and the "Place Order" button, he was presented with either the phrase, "By continuing past this page, you agree to our Terms of Use," or "By clicking 'Place Order,' you agree to our Terms of Use." Id. The phrase "'Terms of Use' was displayed in blue font and contained a hyperlink to Ticketmaster's Terms." Id. Based on these facts the circuit concluded that the

plaintiff "validly assented to Ticketmaster's Terms of Use, including the arbitration provision, each time he" clicked both the "Sign In" button and the "Place Order" button. Id.

In Dohrmann v. Intuit, Inc., No. 20-15466, 2020 WL 4601254, at *2 (9th Cir. Aug. 11, 2020), users accessing their TurboTax account, were "required to click a 'Sign In' button, directly under which the following language appeared: '*By clicking Sign In, you agree to the Turbo Terms of Use, TurboTax Terms of Use, and have read and acknowledged our Privacy Statement* "The terms 'Turbo Terms of Use,' 'TurboTax Terms of Use,' and 'Privacy Statements' were each light blue hyperlinks which, if clicked, directed the user to a new webpage." The Ninth Circuit found that the website "therefore required users to 'affirmatively acknowledge' the agreement before proceeding, and the website contained 'explicit textual notice that continued use will act as a manifestation of the user's intent to be bound." Id. (quoting Nguyen, 763 F.3d at 1176).

The StubHub Plaintiffs argue that neither the user registration page nor the sign-in page was sufficient to establish inquiry notice. Opp'n at 9-15. As to the sign-in page, the StubHub Plaintiffs argue that "the sign-in screen was changed sometime (Plaintiffs do not know when) after April 2019, to remove the link to the [User Agreement], or any mention of it, so the inference that the notification was in place when" the StubHub Plaintiffs purchased their tickets "is unfounded." Id. at 9. There is no "inference," however. Todd Northcutt, Senior Director of Product Management at StubHub, states directly that the sign-in screen had the relevant text when each of the StubHub Plaintiffs purchased tickets. Northcutt Decl. ¶¶ 1, 18. Neither Canela nor Woolley states that the sign-in screen did *not* have that text when they purchased tickets; they merely state they "did not notice links to the user agreement." See Dkts. 85-1, 85-2. In light of this evidence, the screenshots from July 2020, six months after Plaintiffs purchased their at-issue tickets, are irrelevant. See Dkts. 86 ¶¶ 3-5, 86-1. Alternatively, StubHub Plaintiffs argue that the text on the sign-in screen is inconspicuous because the font is small, the links are not

8

underlined, and there are "other far more eye-catching links on the page." Opp'n at 11.

StubHub Plaintiffs also argue that StubHub Defendants have not established that the registration page notice was conspicuous because StubHub provides a current version of the registration page and only verbally states that StubHub Plaintiffs saw that when they registered. Opp'n at 13. But Northcutt testifies that at the time Canela and Woolley "each registered as StubHub users, the words 'user agreement' on the pages they each saw were (and still are) hyperlinks in bolded, offset font, that when clicked, open a separate page that contains the StubHub User Agreement." Northcutt Decl. ¶ 14.

The Court finds these two pages show both that StubHub Plaintiffs had inquiry notice and that there was mutual assent to the agreement. As in Nguyen, StubHub Plaintiffs had to "affirmatively acknowledge the [User Agreement] before completing [their] online purchase." 763 F.3d at 1176. The structure and indications of conspicuousness here are the same or similar to those present in both Lee and Dohrmann. See Lee, 817 F. App'x at 393; Dohrmann, 2020 WL 4601254, at *2. In all, the words "user agreement" or "terms of use" were offset in a different color and hyperlinked to the applicable policy. Here, the text was also located either directly or almost directly below the applicable button. See Lee, 817 F. App'x at 393 (holding that notice was sufficient where applicable text was "three lines below the button").[2]

---

[2] Plaintiffs' supplemental authority, see Dkt. 100, does not convince the Court otherwise. The facts here differ from those in Berman v. Freedom Financial Network, LLC, No. 18-cv-01060-YGR, 2020 WL 5210912 (N.D. Cal. Sept. 1, 2020) in two significant ways. First, the "user agreement" text is offset from the rest of the text in blue font while the entire sentence in Berman was in black font. Id. at *3. Additionally, in Berman, the court found "click[ing] a button to continue using" the site was "completely divorced from an expression of assent to the Terms & Conditions." Id. Here, the text

9

The Court also disagrees with the StubHub Plaintiffs' assertion that "[i]ncluding disclosures on different pages in different spots and of varying (but always insufficient) prominence, and using different language," makes it *less* likely that consumers will be put on notice of the agreement. Opp'n at 16. StubHub consistently referred to the User Agreement as "User Agreement," put those words in blue text, and hyperlinked the term to the user agreement. The Court further disagrees with the StubHub Plaintiffs' muddled argument that by encountering the homepage first, the site experience "undermines the inference that by taking some action later, including registering, or signing-in, they are evidencing an objective manifestation to be bound." Id. at 16-17. The StubHub Plaintiffs present no evidence of such user confusion, and the Court declines to hold that websites should inform users of their policies less often rather than more.

## B. Validity of the Arbitration Provision

The StubHub Plaintiffs also argue that the arbitration provision is void and unenforceable under California law because it "requires that 'any and all disputes or claims' be resolved 'exclusively through final and binding arbitration'" and "forbids the arbitrator from awarding relief for the general public" in violation of the McGill Rule. Opp'n at 17-18. StubHub Defendants maintain that McGill is inapplicable and the Arbitration Provision is valid because the StubHub Plaintiffs assert individual claims for monetary relief. Dkt. 95 (Reply) at 10.

Generally, "public injunctive relief under the UCL, the CLRA, and the false advertising law is relief that has 'the primary purpose and effect of' prohibiting unlawful acts that threaten future injury to the general public." McGill v. Citibank, N.A., 2 Cal. 5th 945, 955 (2017) (quoting Broughton v. Cigna Healthplans of Cal., 21 Cal. 4th 1066, 1077 (1999)). In McGill, the California Supreme Court held that an arbitration provision that waives the right to seek public injunctive

---

unequivocally states that by purchasing tickets or signing in a consumer is expressing assent.

10

relief in any forum is "contrary to California public policy and is thus unenforceable under California law." Id. at 952, 961; see also Blair v. Rent-A-Ctr., Inc., 928 F.3d 819, 830-31 (9th Cir. 2019) (holding that "the FAA does not preempt the McGill rule").

The Ninth Circuit has held that an arbitration agreement that "prohibits the arbitrator from awarding 'relief that would affect [consumers] other than [the plaintiff],' and eliminates any 'right or authority for any dispute to be brought, heard, or arbitrated as a class, collective, mass, private attorney general, or representative action' . . . precludes the arbitrator from awarding public injunctive relief" and is unenforceable under McGill. Blair, 928 F.3d at 831. StubHub's arbitration provision clearly provides that: "ANY RELIEF AWARDED CANNOT AFFECT OTHER USERS OR THE GENERAL PUBLIC." Northcutt Decl. ¶ 33. The Court assumes for this purpose that the arbitration provision allows a party to prevent adjudication of public injunctive relief in any forum by electing arbitration in violation of McGill.

The StubHub Plaintiffs argue that this invalidates the arbitration provision they seek public injunctive relief on their CLRA and UCL claims. Opp'n at 18-19. The StubHub Defendants argue that Plaintiffs, in a "strategic pleading tactic[]" are "attempt[ing] to disguise their requests for cash refunds as public injunctive relief." Reply at 10.

Courts do not take relief styled as a "public injunction" at face value. The Blair court explained:

> Private injunctions "resolve a private dispute" between the parties and "rectify individual wrongs," though they may benefit the general public incidentally. By contrast, public injunctions benefit "the public directly by the elimination of deceptive practices," but do not otherwise benefit the plaintiff, who "has already been injured, allegedly, by such practices and [is] aware of them."

Blair, 928 F.3d at 824 (alteration in original) (citation omitted) (quoting McGill, 2 Cal. 5th at 955). Public injunctive relief under the UCL and

11

CLRA aims to restrain an unlawful act "that threaten[s] *future* injury to the general public." Id. (emphasis added). "Merely requesting relief which would generally enjoin a defendant from wrongdoing does not elevate requests for injunctive relief to requests for public injunctive relief." Johnson v. JP Morgan Chase Bank, N.A., No. EDCV 17-2477 JGB (SPx), 2018 WL 4726042, at *6 (C.D. Cal. Sept. 18, 2018); see also Wright v. Sirius XM Radio Inc., No. SACV 16-01688 JVS (JCGx), 2017 WL 4676580, at *9 (C.D. Cal. June 1, 2017) (holding that "vague, generalized allegations [seeking an order 'enjoining Defendant from committing such unlawful, unfair, and fraudulent business practices'] do not request public injunctive relief," and that "any benefit to the public is merely 'incidental'").

In Delisle v. Speedy Cash, No. 19-55794, 2020 WL 3057464, at *1 (9th Cir. June 9, 2020), plaintiffs requested a public injunction pursuant to the UCL and CLRA barring Speedy Cash from "issuing loans greater than $2,500 with an annual percentage rate of interest ('APR') of 90% and requiring Speedy Cash to issue 'corrective advertising' about prior loans. However, during the appeal, "a California statute took effect that prohibit[ed] finance lenders" from issuing such loans between $2,500 and $10,000. Id. Because "the operative complaint d[id] not specifically allege that Speedy Cash issued or continues to issue loans greater than $10,000," the Ninth Circuit found "questionable" "[w]hether the injunction would prevent a threat of future harm." Id.

Similarly, in Johnson, the court found that plaintiffs did not seek public injunctive relief despite "craft[ing] their allegations and prayer for relief to request expressly a general injunction and public injunctive relief" because the plaintiff actually intended to seek redress for and prevent injury to a group of plaintiffs that had already been injured, not the general public. 2018 WL 4726042, at *7. The court determined that the requested injunctive relief provided "no real benefit to the public at large" because the class of people who stood to benefit from the relief was limited to those who had entered contractual agreements with JPMorgan. Id.

12

And in Sponheim v. Citibank, N.A., No. SACV 19-264 JVS (ADSx), 2019 WL 2498938, at *5 (C.D. Cal. June 10, 2019), where plaintiff brought claims on behalf of a limited class – "California plaintiffs that have held Citibank checking accounts within the applicable statute of limitations," the court held that the public injunctive relief plaintiff purported to seek was "a mere incidental benefit to his primary aim of gaining compensation for injury for himself and others similarly situated."

Plaintiffs request a purported "public injunction" described as follows:

> (i) providing full restitution to Plaintiffs and Class members including a full refund of the ticket price and all ancillary costs; (ii) enjoinment of Defendants from committing future violations of California's [CLRA and UCL]; (iii) requiring Defendants to provide an accounting of all monies obtained for 2020 MLB regular season tickets; (iv) requiring Defendants to give individualized notice to all consumers who purchased 2020 MLB regular season tickets of their rights with respect to Defendants' violations of California law; (v) requiring Defendants to provide individualized notice to each consumer of the procedures available for enforcing their rights; (vi) a prohibition on Defendants' future denials of refunds for 2020 MLB regular season tickets; and (vii) full restitution to Plaintiffs and Class Members.

Corr. Am. Compl. ¶¶ 117, 125, 129.

The first, fourth, fifth, sixth, and seventh items are not public injunctive relief requests. Each pertains only to a limited group of individuals – those who purchased 2020 MLB regular season tickets through one of the Defendants. The second and third requests are the only arguably "public" benefits, and yet it is unclear what they ask for or why they are included other than as an attempt to allow StubHub Plaintiffs to avoid arbitration. The second request is a "vague,

13

generalized allegation[]" that "do[e]s not request public injunctive relief," and adds nothing more than is already required by law. It is unclear what the third request aims to do or how it differs from the information Stub Hub Plaintiffs will request in discovery. And each of them presumably knows the amounts each paid for tickets. Anything beyond that is irrelevant. In any event, the Court concludes any benefit to the public that does accrue from it is merely "incidental." <u>McGill</u>, 2 Cal. 5th at 955.[3]

This is a dispute between the StubHub Defendants and a limited group of people – those who purchased tickets for the 2020 MLB regular season from StubHub or LMT. It is also a dispute limited in time. No party contends that the StubHub Defendants continue to sell tickets to 2020 MLB regular season games. There is no reason, then, for Plaintiffs' fashioning of purported public injunctive relief other than to escape arbitration. Therefore, <u>McGill</u> does not prohibit enforcement of the User Agreement's arbitration provision.

## IV. CONCLUSION

The StubHub Defendant's Motion to Compel Arbitration of Canela and Woolley's claims is GRANTED and Canela and Woolley are ORDERED to submit to arbitration pursuant to the terms of the arbitration provision, <u>see</u> 9 U.S.C. § 5, if they wish to pursue their claims.

Canela and Woolley's claims asserted against the StubHub Defendants are STAYED pending resolution of the arbitration. <u>See id.</u> § 3. The parties are to file a joint status report every 120 days, with the first report due January 12, 2021. Each report must state on the

---

[3] Though in <u>Blair</u> the claims for public injunctive relief were styled similarly to those at issue here, <u>see</u> 928 F.3d at 823, they related to ongoing, not past, conduct, <u>see</u> <u>Kilgore v. KeyBank, Nat'l Ass'n</u>, 718 F.3d 1052, 1061 (9th Cir. 2013) (because defendant "had completely withdrawn from the private school loan business" the "injunctive relief sought . . . for all practical purposes, relates only to past harms suffered by the members of the limited putative class").

cover page the date the next report is due. The parties must advise the Court within 30 days of issuance of the final arbitration decision.

    IT IS SO ORDERED.

Date: September 14, 2020

                                      Dale S. Fischer
                                      United States District Judge